# Exhibit A

2120 - Served        2121 - Served
2220 - Not Served    2221 - Not Served
2320 - Served By Mail   2321 - Served By Mail
2420 - Served By Publication    2421 - Served By Publication
Summons - Alias Summons                   **(01/25/17) CCG N001**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Beth Kingsbury, Jill Koenig, Savannah Williams,
_____
(Name all parties)

v.

Allison Clark, Keegan Kok, Mattia Nanfria, Emma Fine, Lamont Campbell, Sr. David Todd a/k/a David Todd Perelmutter, Christopher Wojnar, Michael Elrod, and Lyft, Inc.

No. 2017 CH 01825

Please Serve: Lyft Inc. c/o Incorporating Services Ltd.,
901 S 2ND ST #201
Springfield, Illinois 62704

### ◉ SUMMONS ◯ ALIAS SUMMONS

To each Defendant:

    YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room **802** _____, Chicago, Illinois 60602
☐ District 2 - Skokie       ☐ District 3 - Rolling Meadows     ☐ District 4 - Maywood
    5600 Old Orchard Rd.        2121 Euclid                  1500 Maybrook Dr.
    Skokie, IL 60077          Rolling Meadows, IL 60008     Maywood, IL 60153
☐ District 5 - Bridgeview    ☐ District 6 - Markham 16501    ☐ Child Support: 50 W.
    10220 S. 76th Ave.          S. Kedzie Pkwy. Markham,     Washington, LL-01,
    Bridgeview, IL 60455       IL 60428                 Chicago, IL 60602

You must file within 30 days after service of this Summons, not counting the day of service.

IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

☑ Atty. No.: 80919
Name: Frymire/Robbins, Salomon & Patt Ltd.
Atty. for: Plaintiffs
Address: 180 N. LaSalle St. Suite 3300
City/State/Zip Code: Chicago, IL 60601
Telephone: (312) 782-9000
Primary Email: cfrymire@rsplaw.com
Secondary Email: cfrymire@rsplaw.com
Tertiary Email: _____

Witness: **DOROTHY BROWN** FEB 1 4 2017

_Dorothy Brown_
DOROTHY BROWN, Clerk of Court
Date of Service: 3/22/17
(To be inserted by officer on copy left with Defendant or other person)

**Service by Facsimile Transmission will be accepted at:**

_____
(Area Code)    (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
Page 1 of 1

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| BETH KINGSBURY, an individual, JILL KOENIG, an individual, SAVANNAH WILLIAMS, an individual, individually (Counts I-XI) and on behalf of all other similarly situated Plaintiffs (Counts X-XI), | ) ) ) ) ) ) | 2017CH01825 CALENDAR/ROOM 05 TIME 00:00 General Chancery |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. |
| ALLISON CLARK, an individual, KEEGAN KOK, an individual, MATTIA NANFRIA, an individual, EMMA FINE, an individual, LAMONT CAMPBELL, SR., an individual, DAVID TODD a/k/a David Todd Perlmutter, an individual, CHRISTOPHER WOJNAR, an individual, MICHAEL ELROD, an individual, LYFT INC., a Delaware Corporation, | ) ) ) ) ) ) ) ) ) | Jury Demanded |
| Defendants. | ) ) | |

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiffs Beth Kingsbury ("Kingsbury"), Jill Koenig ("Koenig"), and Savannah Williams ("Williams") (collectively "Plaintiffs"), by and through their attorneys of the law firm of Robbins, Salomon & Patt, Ltd., for their Verified Complaint for Injunctive and Other Relief against Defendants, Allison Clark ("Clark"), Keegan Kok ("Kok"), Mattia Nanfria ("Nanfria"), Emma Fine ("Fine"), Lamont Campbell, Sr. ("Campbell"), David Todd ("Todd"), Christopher Wojnar ("Wojnar"), Michael Elrod ("Elrod") (collectively "Individual Defendants") and Lyft Inc. ("Lyft") (together with Individual Defendants "Defendants"), hereby allege and state as follows:

1

## ALLEGATIONS COMMON TO ALL COUNTS

### The Parties

1.   Kingsbury is an individual who resides in Chicago, Illinois.

2.   Koenig is an individual who resides in Chicago, Illinois.

3.   Williams is an individual who resides in Chicago, Illinois.

4.   Clark is an individual who, upon information and belief, resides in Mount Prospect, Illinois.

5.   Elrod is an individual who, upon information and belief, resides in Midlothian, Illinois.

6.   Wojnar is an individual who, upon information and belief, resides in Elmhurst, Illinois.

7.   Fine is an individual who, upon information and belief, resides in Chicago, Illinois.

8.   Todd is an individual who, upon information and belief, resides in Elk Grove Village, Illinois.

9.   Kok is an individual who, upon information and belief, resides in Chicago, Illinois.

10.   Campbell is an individual who, upon information and belief, resides in Oak Park, Illinois.

11.   Nanfria is an individual who, upon information and belief, resides in Chicago Illinois.

12.   Defendant Lyft is a Delaware corporation with its headquarters and principal place of business in San Francisco, California. Lyft has an office located in Chicago, Illinois.

2

## Jurisdiction And Venue

13.     Jurisdiction is proper pursuant to Illinois statute 735 ILCS 5/2-209 because Defendants transact business within the state of Illinois and committed tortious acts within the state of Illinois.

14.     Venue is proper in Cook County pursuant to 735 ILCS 5/2-101 because the events and actions which form the basis of this Complaint occurred in Cook County and a substantial number of the defendants joined in good faith reside in Cook County.

## Background

15.     Lyft is a San Francisco, California-based car service and rideshare service that promotes itself as a transportation networking company. Lyft was founded in San Francisco, CA in July of 2012.

16.     By means of its mobile application software (the "Lyft Platform") Lyft provides a means to enable a person who seeks transportation to a destination via automobile ("Rider(s)") to be picked up by a nearby person who is willing to transport the Rider to his or her destination via automobile ("Driver(s)").

17.     Drivers also have the ability to act as Brand Ambassadors ("Ambassadors") and be a part of an Ambassador Program where they can participate in marketing Lyft and soliciting potential Riders and Drivers in their local markets and wherever Lyft operates.

18.     Pursuant to the Ambassador Program, Lyft provides materials to the Ambassadors, such as clothing, bottle openers, backpacks, and other items with Lyft's logo and customized cards for specific special events, so that the Ambassadors can promote Lyft, increase brand recognition and recruit Riders or Drivers.

19.    Ambassadors are also given opportunities to work events and be compensated with hourly rates.

20.    On or about July 3, 2014, Koenig began working for Lyft as a Driver.

21.    In and around July of 2014, Kingsbury began working for Lyft as a Driver.

22.    On or about May 3, 2013, Williams began working for Lyft as a Driver.

23.    Williams has been considered a "Founding Lyft Driver" as she was one of the first hires and the first Lyft Driver to give a Lyft ride in the City of Chicago.

24.    As a Founding Lyft Driver, Williams engaged in various promotional and advocacy events, was asked by Lyft management team to act as a spokesperson on behalf of the company at hearings, legislative meetings and in the media.

25.    In this role, she developed a reputation as a top Driver, a key member of the Lyft community, and an important community resource.

26.    A true and accurate copy of the Lyft Terms of Service applicable to the Plaintiffs while they operated as Drivers is attached hereto as **Exhibit 1** ("Driver Terms").

27.    After the Plaintiffs began working as Drivers, they were accepted into Lyft's Ambassador Program and participated in Lyft's promotional program as Ambassadors.

28.    A true and accurate copy of the Lyft Ambassador Program Terms of Service applicable to Plaintiffs while they operated as Ambassadors is attached hereto as **Exhibit 2** ("Ambassador Terms").

29.    By accepting the Ambassador Terms, Plaintiffs agreed to promote Lyft and Lyft's services.

4

30.    One of the ways in which Plaintiffs promoted Lyft's services was by distributing Rider and Driver referral cards that contain the Lyft logo and promo codes ("Ride Code(s)") for individuals to use when they sign up to become Lyft Riders or Drivers.

31.    Each Ambassador has unique Ride Codes that are linked only to that Ambassador. A copy of one of the Plaintiff's referral cards with the Ride Code is attached hereto as Exhibit 3.

32.    Pursuant to the Ambassador Terms, in exchange for Plaintiffs' promotional efforts, Lyft agreed to pay Plaintiffs a fee each time the unique Ride Code is "fully redeemed."

33.    Pursuant to the Ambassador Terms, a Ride Code is fully redeemed when a new passenger (i) enters the Ride Code in the creation of their new Lyft account, and (ii) completes their first ride using the Lyft Platform.

34.    The Ride Code is also fully redeemed when a referral enters the Ride Code in the creation of their new Lyft account and is then accepted to become a Lyft Driver and completes the required number of rides and all other requirements.

35.    Thus, when a new Rider/Driver uses the Ride Code linked to the specific Ambassador, that Ambassador receives a commission for his/her promotional efforts.

36.    Ambassadors participating in the Lyft Ambassador Program are able to earn a minimum of $5 per passenger referral and up to $1,000 per driver referral.

37.    Ambassadors are able to track the number of people redeeming their Ride Codes via Plaintiffs' online Lyft dashboard ("Dashboard") associated with their Driver and Ambassador accounts.

38.    Upon information and belief, at all relevant times herein, the Individual Defendants worked for Lyft as Drivers and/or Ambassadors.

**Policy and Procedure to Freeze Out Plaintiffs**

39. Shortly after they began participating in the Ambassador Program, Plaintiffs learned that they were able to make significant amounts of money promoting on popular streets in downtown Chicago and around the Chicagoland area.

40. For example, from September to December of 2015, Koenig earned approximately $40,000 working as an Ambassador.

41. Koenig, Kingsbury and Williams routinely worked together and passed out their referral cards as a group.

42. As Top-Rated Drivers/ Ambassadors, Plaintiffs were invited as Drivers and Ambassadors by Lyft to attend various events and/or assist in exclusive promotional events for Lyft such as (1) job fairs; (2) lobbying legislators in Springfield for favorable rideshare legislation; (3) meeting with local alderman and testifying in town hall meetings and community meetings on behalf of Lyft; (4) recruiting events to obtain new Rider/Driver referrals at festivals such as Jazz Fest, Riot Fest, TBOX, Food and Wine Fest; (5) entertaining Lyft's elite and most cherished heavy use passengers at exclusive Lyft Nation events; (6) hosting Lyft clients at Wrigley Field; (7) providing Lyft's clients with food/drink vouchers and Lyft swag; (8) and distributing promotional coasters to local bars.

43. In addition, at various times, Plaintiffs volunteered their time and efforts to promote Lyft, allowed Lyft to use their image and likeness, and assisted in building up brand recognition and Lyft community morale, without compensation.

44. Williams traveled to Indianapolis, IN, Madison, WI, among other places, at her own expense, to help launch Lyft in those cities.

45.     Williams was also chosen to be a part of the Lyft Mentor Program and she received the Lyft Golden Fistbump award in September of 2013, which is an award given to outstanding Lyft Drivers and Ambassadors that have gone over and above to help other Drivers and Ambassadors, passengers and build the community.

46.     Due to Williams' reliability, professionalism, and high Driver rating, Lyft used Williams' image and likeness on Lyft brochures and other promotional products.

47.     Williams also volunteered her time to be a consultant to producers and the Academy Award winning Director, John Kahrs ("Kahrs"), to provide an account of her experience as the first Lyft Driver to give a ride to a passenger in Chicago and assist in creating a short film that promoted Lyft.

48.     As part of her involvement, Williams introduced Kahrs and other producers to the historic features of the Bronzeville neighborhood, where Williams' lives.

49.     After meeting with Williams, Lyft created the short film based upon Williams' experiences as a Lyft Driver.

50.     Many of the sites Williams introduced to Kahrs and the producers are depicted in the short film.

51.     In addition, film makers told Williams that they wanted a character in the short film to be based on Williams' character and likeness—to which Williams' agreed.

52.     Much of the essence of the storyline, neighborhood, and concept came from suggestions and input from Williams.  See correspondence from Williams attached hereto as Exhibit 4.

53.     Instead of rewarding Williams for her time and efforts in assisting with the Lyft promotional short film, Lyft demanded that the Kahrs remove Williams' name from the credits.

54. Kahrs was so distraught over having to remove her name from the credits and discount Williams, who was so instrumental in the creation of the short film from the credits, that he wrote Williams a letter apologizing to Williams and thanking her for her invaluable services. A true and accurate copy of the correspondence from Kahrs is attached hereto as **Exhibit 5**.

55. Upon information and belief, Lyft demanded that Williams' name be removed from the credits because she is associated with Koenig and Kingsbury and Lyft wanted to continually outcast Plaintiffs in an attempt to wrongfully keep Plaintiffs' compensation down and damage their reputations.

56. Kingsbury was also chosen to be a part of the Lyft Mentor Program.

57. Kingsbury is a five (5) star rated Driver with over 1700 rides to her credit. See letter from Hector at Lyft Support desk dated October 3, 2016, attached hereto as **Exhibit 6**.

58. Williams and Koenig are also five (5) star rated Drivers and they received similar emails over the course of their tenure with Lyft.

59. Despite Plaintiffs' dedication to Lyft, Lyft engaged in a scheme to deprive Plaintiffs of their earned compensation and it encouraged and intentionally ignored a blatant company-wide policy that allowed Lyft personnel and other Ambassadors to harass and intimidate Plaintiffs.

60. Upon information and belief, Koenig's high earnings caught the eye of Lyft managers and administrators located in Lyft's Chicago offices.

61. Upon information and belief, in an effort to keep wages and compensation down, stifle competition, or otherwise obstruct Plaintiffs' ability to earn high compensation, Lyft management engaged in a scheme to stir up resentment towards the Plaintiffs by (1) giving other Drivers and Ambassadors in the Chicagoland area access to Plaintiffs' earnings and other

account related information; (2) spreading the word that Plaintiffs were high earners (or associated with high earners); (3) encouraging other Lyft Drivers and Ambassadors to spy on Plaintiffs to determine how they were earning commissions at a higher rate than other Ambassadors; (4) encouraging other Drivers and Ambassadors to freeze out and harass Plaintiffs while they were on the streets soliciting referrals; (5) falsely telling other Lyft personnel that Plaintiffs are "hostile" toward the company; and (6) accusing Plaintiffs (and falsely informing other Lyft personnel) that Plaintiffs were violating Lyft agreements, including the Driver Terms and Ambassador Terms.

62.     Contrary to Lyft's accusations and false testaments, at all times relevant herein, Plaintiffs were loyal to Lyft and they followed the terms of their agreements with Lyft.

### Harassment on the Streets

63.     When Plaintiffs first began to pass out referral cards, they rarely encountered other Lyft Ambassadors on the street.

64.     When Plaintiffs would first begin working for the day, they would intentionally and routinely survey the location where they intended to pass out referral cards to make sure that there were no other Lyft Ambassadors in the area, ensuring that they were not encroaching on other Ambassadors efforts to reach potential referrals.

65.     However, as time passed, the number of other Lyft Ambassadors and Drivers that the Plaintiffs encountered on the street grew and in and around May of 2016, Plaintiffs recognized that other Lyft Drivers and Ambassadors were participating in a scheme to interfere with the Plaintiffs' solicitation efforts and intimidate the Plaintiffs while they were on the street promoting Lyft and passing out Ride Codes.

66.     The Individual Defendants, sometimes in a group, and sometimes individually, would engage in intimidating behavior towards the Plaintiffs, such as jumping out of cars and aggressively approaching Plaintiffs, verbally harassing and bullying Plaintiffs, and surrounding Plaintiffs while they were on the street.

67.     The Individual Defendants would box the Plaintiffs in one location in an orchestrated effort to prevent Plaintiffs from carrying out their tasks as Lyft Ambassadors and to intimidate and harass the Plaintiffs.

68.     The Individual Defendants engaged in a practice of inciting others to harass, and disturb the Plaintiffs while they were promoting on the street, encouraging other Lyft Drivers and Ambassadors to ambush Plaintiffs while they were working.

69.     The Individual Defendants would find out where the Plaintiffs were passing out their referral cards and they would show up at the same location, surround the Plaintiffs, at times less than a couple of feet away, stand directly in the traffic path of Plaintiffs, and begin passing out their own referral cards with the Individual Defendants' Ride Codes on them.

70.     The Individual Defendants would take pictures of Plaintiffs on the street, post the pictures on social media, disclose the exact location where Plaintiffs were promoting, and enlist other Ambassadors to join them in obstructing the Plaintiffs' efforts.

71.     The Individual Defendants knew that they were negatively affecting the Plaintiffs ability to get the Plaintiffs' referral codes into the hands of prospective referrals and when Plaintiffs attempted to pass out their referral codes, many potential referrals refused to take the Plaintiffs' cards stating that they just received another card from one of the Individual Defendants down the street.

72.     On numerous occasions Plaintiffs would see potential referrals walking towards them with one of the Individual Defendants' referral cards in their hands.

73.     On one occasion, Clark posted in the Heavy Lyfters Facebook group "Impromptu city promo session if anyone wants to join. I'll be here until 2. Private message me for location info."

74.     At the time Clark posted this message, she was standing directly in front of Koenig.

75.     In addition to standing directly in front of Plaintiffs while Plaintiffs were passing out their referral cards, the Individual Defendants also falsely told pedestrians that Plaintiffs Ride Codes did not work and that they should not use Plaintiffs' Ride Codes.

76.     The Individual Defendants also told pedestrians that their Ride Codes offered better deals and were superior to the Plaintiffs' Ride Codes.

77.     Due to the Individual Defendants "upstreaming" and orchestrated behavior to interfere with, surround, and intimidate Plaintiffs, Plaintiffs were deprived of the ability to earn referral fees and effectively promote Lyft.

78.     The Individual Defendants' harassment and intimidating behavior towards the Plaintiffs became so obstructive and aggressive that Plaintiffs felt threatened for their safety, such that on October 22, 2016, Koenig spoke to Chicago Police Officers, notifying them of the threatening behavior,  followed-up with the Chicago Police Department and reported Todd for assault.

79.     On October 22, 2016, following hours of harassing, intimidating and threatening behavior by Campbell, Todd, and three (3) other Ambassadors, one of whom admitted that they were following the lead of Campbell and Todd, Williams placed a call to Lyft Trust and Safety,

11

following Lyft's own protocol, and reported the incident. See correspondence from Williams to Lyft Trust and Safety attached hereto as **Exhibit 7**.

80.     Thereafter, the Plaintiffs filed a police report against Todd, report No. HZ-487860. A true and accurate copy of the Police Report is attached hereto as **Exhibit 8**. Also attached hereto as **Exhibit 9**, is a picture of Todd being arrested for his aggressive and disruptive conduct.

### False Accusations

81.     In and around February 16, 2016, a Facebook group called the "Heavy Lyfters" was created by Nanfria, Campbell and Kok as a platform for Lyft Drivers and Ambassadors to promote Lyft and discuss Lyft related topics.

82.     Heavy Lyfters has over 1000 members nationwide, with many of the members being Lyft management employees, Lyft contractors, Drivers and Ambassadors.    Laura Copeland, Head of Driver Communications, is listed as member since the Heavy Lyfters group's inception.

83.     The Heavy Lyfters group has been endorsed and promoted by Lyft through email and at promotional events.

84.     Plaintiffs either joined the group or were added to the group by its administrators shortly after its inception.

85.     In May of 2016 it became apparent that members of the Heavy Lyfters Facebook group were deliberately encouraging other Lyft Drivers and Ambassadors in the Chicagoland area to harass, interfere and intimidate the Plaintiffs while they were on the street promoting Lyft. See Heavy Lyfters Facebook group chat attached hereto as **Group Exhibit 10**.

86.    At that time, Koenig began calling Lyft Critical Response Hotline, which is a hotline accessible to Lyft Drivers, Ambassadors, and passengers when they do not feel safe, to report the ongoing threating and harassing behavior.

87.    In addition, in early October of 2016, the Individual Defendants made false and misleading statements about the Plaintiffs in the Heavy Lyfters Facebook group regarding the Plaintiffs as Ambassadors and labeling Plaintiffs as a "pack of bullies" that engaged in dirty tactics.

88.    On or around October 1, 2016, Nanfria made statements to the Heavy Lyfters group page alluding to Plaintiffs as a group of "greedy, selfish, self-serving weirdos." Talking about the Plaintiffs, Nanfria also stated, "I'm about to out the people who are doing this, don't worry guys."

89.    In an attempt to hide the Individual Defendants' wrongful conduct and in an effort to incite other members to resent and retaliate against Plaintiffs, the members of the Heavy Lyfters spread false accusations that Plaintiffs were the ones on the streets harassing other Lyft Drivers and Ambassadors, when the exact opposite was true.

90.    An example of the accusations against Plaintiffs can be found on a lengthy post made in the Heavy Lyfters Facebook Group on October 2, 2016, by Nanfria. In this post she called out Koenig and Kingsbury for many alleged offenses including bullying, harassing, intimidating, and scaring other "Lyfters", and making up fake Ambassador Terms of Service. Embedded within that post was an email from Clark to Nanfria accusing Plaintiffs of bullying and harassing other Ambassadors as well. See Heavy Lyfters Facebook Group 10/2/2016 postings, attached hereto as **Group Exhibit 11.**

91. Due to the false, harassing, and threating posts, Plaintiffs filed a police report for harassment. See Police Report No. HZ-464268, attached hereto as Exhibit 12.

92. In addition, Clark posted in the Heavy Lyfters Facebook group, stating that Koenig and Kingsbury were associated with homeless people that approach and assault Ambassadors on the street and otherwise engage in wrongful practices.

93. In response to these false accusations, members of the Heavy Lyfters began to retaliate against Plaintiffs, threatening to harm Plaintiffs. See some of the various threatening Facebook posts written in response to the Individual Defendants' accusations, attached hereto as Exhibit 13.

94. In an attempt to provoke and intimidate Plaintiffs, Nanfria, called on Koenig and Kingsbury to "defend themselves" in one of her posts.

95. Upon information and belief, the Individual Defendants also spread false rumors to other Lyft Drivers and Ambassadors using the Heavy Lyfters Facebook group, and other social media networks/platforms.

96. The Individual Defendants also verbally spread false rumors to other Lyft Drivers, Ambassadors and management, stating that Plaintiffs were stalking and harassing other Lyft Drivers and Ambassadors.

97. Despite the Plaintiffs' requests, the Heavy Lyfters Facebook group has not been deactivated and upon information and belief, Lyft has done nothing to notify or work with Facebook to remove the false and threatening statements made therein.

98. The Plaintiffs have been removed from the group and have been blocked from viewing the postings on the Heavy Lyfters Facebook group, and the full extent of the false, threatening, harmful and defamatory statements is unknown at this point.

99.  Upon information and belief, several people that were associated with Plaintiffs or came to Plaintiffs' defense have been removed from the Facebook group as well.

### Plaintiffs Notify Lyft

100.  In and around May of 2016, the Plaintiffs first began notifying Lyft that some of Lyft's Ambassadors and Drivers were engaging in hostile and intimidating conduct towards Plaintiffs.

101.  Plaintiffs have contacted Lyft Critical Response Line Representatives via phone and email no less than seven (7) times from May to December 2016, regarding seven (7) separate incidents.

102.  In each of these communications, Plaintiffs notify Lyft that they believe that their safety is being threatened and that the Individual Defendants are interfering with Plaintiffs' ability to do their jobs.

103.  By way of example, a detailed account of the ongoing intimidation and harassing behavior the Plaintiffs were experiencing is codified in an email dated October 27, 2016 from Williams to Lyft Support, and attached hereto as Exhibit 7.

104.  Plaintiffs also informed Lyft that other Lyft Drivers, Ambassadors, and employees were spreading false and damaging information about the Plaintiffs on the internet. See email correspondence dated October 14, 2016 from Kingsbury to Lyft Support, attached hereto as Exhibit 14.

105.  Lyft informed Plaintiffs that if they had concerns for their safety, they should contact the police.

106.  As indicated above, Plaintiffs followed Lyft's direction and informed the police of the ongoing harassment they were experiencing from other Lyft Ambassadors.

107.    Despite Plaintiffs' repeated notifications to Lyft regarding (1) the false and inflammatory accusations about the Plaintiffs which were posted on a Lyft endorsed and promoted Facebook page; (2) the ongoing harassment, aggressive and verbally abusive behavior by the Individual Defendants and other Lyft Ambassadors and Drivers; and (3) Plaintiffs inability to perform the functions as Ambassadors due to the Individual Defendant's conduct and as a result of the Individual Defendants' instigation and encouragement of other Lyft Ambassadors and Drivers in the ongoing harassment, aggressive, threatening and verbally abusive behavior, Lyft failed to implement any sort of procedure to investigate the wrongdoing, respond to Plaintiffs' concerns or protect the Plaintiffs and otherwise implement a policy to correct the wrongdoing.

108.    Plaintiffs also informed Lyft numerous times that their Dashboards were inoperable or "broken" and that they were not receiving Ambassador related notifications.

109.    While their Dashboards are disabled and their accounts are deactivated, Plaintiffs are unable to track the number of referrals that redeemed the Ride Codes, thus, Plaintiffs are not able to monitor commissions earned from Rider and Driver referrals or maximize their performance and earnings.

110.    Koenig experienced problems with her Dashboard, on and off, for approximately 10 months. See August 27, 2016, Email Response from Lyft Support Representative, attached hereto as **Exhibit 15**.

111.    In early July of 2016, Williams had trouble accessing her Dashboard and Ambassador "Shift Planner," a scheduling app that allows Ambassadors to sign up for Lyft events in Chicago.

112.    Kingsbury began having trouble with her Dashboard in early January 2016.

113. For 10 months her dashboard was often inaccurate or inaccessible for the purpose of tracking results and creating Ride Codes.

114. This issue was repeatedly addressed with Lyft support desk and the Chicago office.

115. Kingsbury began having trouble accessing the Shift Planner for the purpose of signing up for Official Ambassador Events in July 2016.

116. She attended an unpaid training on August 3, 2016, which was required to maintain access to working official events.

117. She notified J.P. Biondi ("Biondi"), Marketing Lead for Lyft Chicago, of her issue and he said it was because of a problem with her email address and indicated it would be resolved.

118. After the training she was still blocked from Shift Planning and followed up with three (3) unanswered emails to the Chicago Ambassador helpdesk until she had to appeal to David Katcher, Chicago's General Manager.

119. On the 18th day from her original email to Biondi, he responded with "Earlier this month we changed the structure of the event ambassador program, and as a result reduced the number of people in Shift Planning and the program. As of now, we won't be reinstating any accounts."

120. Koenig, Kingsbury and Williams' Shift Planner accounts were deactivated, which Lyft failed to reinstate, because Lyft was engaging in a scheme to freeze the Plaintiffs out of working for Lyft.

121. By the summer of 2016, Koenig's dashboard was "broken" a majority of the time.

122. Lyft represented to Koenig that her Dashboard was temporarily disabled because Lyft was having "issues" with her account, but Lyft failed to rectify the "issue" in a timely manner.

123. After repeatedly notifying Lyft of her Dashboard issues and receiving no assistance from Lyft, Koenig began to inquire and investigate the facts and circumstances surrounding the issues with and the eventual disabling of her Dashboard.

124. Koenig came to the conclusion that Lyft engaged in a deliberate practice of disabling the Dashboards of some high earning Ambassadors to deprive them of the ability to earn more money.

125. She also discovered that her Ride Codes were being credited to other Ambassadors/Drivers and that Lyft was/is paying the referral money to other Ambassadors/Drivers.

126. She also discovered that Lyft was inaccurately charging her "tolls" (anywhere from a $5-$15 dollar fee), which Lyft deducted from her account without any justification.

127. As Lyft failed to respond to Plaintiffs and take any meaningful action to address the "broken" Dashboards and the ongoing harassment and assaults on the street, Plaintiffs retained counsel in August of 2016.

128. At that time, counsel for Plaintiffs sent counsel for Lyft bodycam footage of the Individual Defendants' aggressive, intimidating, and harassing conduct, notifying Lyft that its Ambassadors and Drivers were assaulting Plaintiffs on the street.

129. In response, counsel for Lyft assured counsel for Plaintiffs that the video was being reviewed at the highest level at Lyft and that Lyft was looking into who was behind the wrongful behavior.

130. Instead of rectifying the wrongful conduct of the Individual Defendants, Lyft continued to systematically interfere with Plaintiffs' Dashboards and ultimately, Lyft deactivated Plaintiffs Lyft accounts indefinitely, in retaliation for Plaintiffs bringing these problems to Lyft's attention.

131. While Plaintiffs' accounts are deactivated, they are not able to earn any money from referral redemptions or as Drivers.

132. Koenig's Dashboard was officially deactivated on or around November 4, 2016, even though she had been experiencing difficulties with her Dashboard and other Lyft platforms beginning in and around January of 2016.

133. Kingsbury's Lyft account was officially deactivated on or around November 3, 2016, even though she had been experiencing difficulties with her Dashboard and other Lyft platforms beginning in and around January of 2016.

134. Williams' Lyft account was officially deactivated on or around October 29, 2016, two (2) days after Williams' reported ongoing harassment to Lyft Critical Response, and one (1) day after Campbell was arrested for harassment due to Plaintiffs' police report.

135. Prior to being deactivated, Williams was experiencing difficulties with her Dashboard and other Lyft platforms beginning in and around July of 2016.

136. In response to the Plaintiffs' inquiries asking why the Plaintiffs' Lyft accounts were deactivated, counsel for Lyft stated that "in light of the conflicts that were brought to a head with the police reports, Lyft has conditionally deactivated a number of individuals..." See correspondence from Lyft's counsel to Plaintiffs' counsel, attached hereto as **Exhibit 16**.

137. However, the Individual Defendants' accounts have not been deactivated and they have been on the street promoting Lyft, handing out referral cards with their Ride Codes on

them, attending Lyft sponsored events, being rewarded by Lyft, all while the Plaintiffs' accounts are deactivated, they are continually outcast from the company, and their income has been cut off completely.

138.  Thus, instead of deactivating the accounts of those Ambassadors that were harassing Plaintiffs on the street, Lyft deactivated Plaintiffs accounts in retaliation for the Plaintiffs reporting the wrongful behavior to the police and because Lyft wanted to keep compensation down and interfere with Plaintiffs' ability to earn more money.

139.  In addition, now that Plaintiffs' Driver and Ambassador accounts are deactivated they cannot be Lyft passengers and they are not able to review their records.

## COUNT I- BREACH OF CONTRACT
### (Plaintiffs v. Lyft)

1-139  Plaintiffs re-allege paragraphs 1-133 of Allegations Common to All Counts as paragraphs 1-139 of this Count I.

140.  Plaintiffs all entered into valid enforceable contracts with Lyft whereby Plaintiffs agreed to provide Driver and Ambassador services for Lyft and in return, Lyft agreed to compensate Plaintiffs for their efforts in driving and promoting Lyft. *See* Exhibits 1 & 2.

141.  Pursuant to the Driver Terms and Ambassador Terms, Lyft agreed to compensate Plaintiffs when a new passenger redeems one of Plaintiffs' Ride Codes and when a new Lyft Driver redeems one of the Plaintiffs' Ride Codes and meets the requirements to be a Driver.

142.  Upon information and belief, in and around 2016, Lyft personnel began logging into Plaintiffs' Lyft accounts and Dashboards, without Plaintiffs permission, to wrongfully manipulate Plaintiffs' earnings and alter the data so that Plaintiffs would not receive the full compensation they were entitled to under the Driver Terms and the Ambassador Terms.

143. Plaintiffs fully performed services in compliance with the terms of the Driver Terms and Ambassador Terms.

144. Lyft breached their contracts with Plaintiffs by denying Plaintiffs commissions rightfully earned.

145. Due to Lyft's breach of the Driver Terms and Ambassador Terms, Plaintiffs have been damaged in that they have not been paid fees/compensation rightfully earned.

WHEREFORE, Plaintiffs Jill Koenig, Beth Kingsbury, and Savannah Williams pray that judgment be entered in their favor and against Defendant Lyft for the sum to be proven at trial.

## COUNT II-VIOLATIONS OF ILLINOIS WHISTLEBLOWER ACT (740 ICLS 174/15)
### (Plaintiffs v. Lyft)

1-139 Plaintiffs re-allege paragraphs 1-133 of Allegations Common to All Counts as paragraphs 1-139 of this Count II.

140. As discussed above, Plaintiffs notified Lyft on numerous occasions that other Lyft Ambassadors and Drivers were harassing, assaulting, and obstructing Plaintiffs' ability to pass out their referral cards while they were on the street attempting to promote Lyft.

141. Lyft refused to provide any actual assistance to the Plaintiffs and in and around October of 2016, Plaintiffs reported the Individual Defendants' conduct to the Chicago Police.

142. Plaintiffs filed a Police Report against the Individual Defendants for harassment and assault.

143. The Plaintiffs had reasonable cause to believe that they were disclosing information to the Chicago Police concerning the Individual Defendants' violations of State/Federal laws, rules and/or regulations.

21

144.   Within days after filing the Police Report and contacting the Chicago law enforcement regarding the Individual Defendants' conduct, Lyft deactivated Plaintiffs.

145.   Lyft's counsel informed Plaintiffs' counsel that due to the police report, Plaintiffs were deactivated and no longer able to utilize their Dashboard and work for Lyft.

146.   In response to Plaintiff counsel's inquiry as to why the Plaintiffs' accounts were deactivated Lyft's counsel responded, "In light of the conflicts, which were brought to a head with the police reports, Lyft has conditionally deactivated a number of individuals..." See Exhibit 16.

147.   Despite Counsel for Lyft's assurances that "a number of individuals" were being deactivated, Lyft's counsel confirmed that Lyft deactivated Plaintiffs accounts, but "reactivated" the accounts for the Individual Defendants, thereby allowing the Individual Defendants to continue promoting and earning money.  See Email Correspondence from counsel for Lyft to counsel for Plaintiffs, dated November 4, 2016, attached hereto as **Exhibit 17**.

148.   In violation of the Illinois Whistleblower Act, Lyft retaliated against Plaintiffs for disclosing information to a government or law enforcement agency, when the Plaintiffs had reasonable cause to believe that the information disclosed a violation of a State or federal law, rule, or regulation.

WHEREFORE, Plaintiffs Jill Koenig, Beth Kingsbury, and Savannah Williams pray that judgment be entered in their favor and against Defendant Lyft, for all relief necessary to make the Plaintiffs whole, including but not limited to the following, as appropriate:

    (A)   Immediate re-activation of Plaintiffs Dashboard and Lyft account and reinstatement as Lyft Drivers and Ambassadors;

    (B)   Compensation for damages sustained as a result of the violation, with interest;

    (C)   Compensatory damages; and

(D)    Litigation costs and fees, and reasonable allowable attorney's fees pursuant to 740 ILCS 174/30.

## COUNT III-ACCOUNTING
### (Plaintiffs v. Lyft)

1-139   Plaintiffs re-allege paragraphs 1-133 of Allegations Common to All Counts as paragraphs 1-139 of this Count III.

140.   As discussed above, Koenig experienced problems with her Dashboard "mysteriously" turning on and off for approximately 10 months.

141.   Plaintiffs Williams and Kingsbury had similar problems with their Dashboards not being able to be accessed at all times.

142.   Upon information and belief, Lyft intentionally interfered with the Dashboards of some of the high earning Ambassadors in an attempt to keep compensation down.

143.   Upon information and belief, Lyft has engaged in a deliberate practice of disabling the Plaintiffs' Dashboards to deprive them of the ability to earn more money and/or keep proper records of the number of rides given and the number of redeemed Ride Codes, and thus, the amount of money they are owed for their promotional efforts.

144.   In addition, upon information and belief, Lyft allowed or instituted a practice whereby Ride Codes would be wrongfully credited to other Ambassadors/Drivers that were not associated with the specific Ride Codes, and thus, Lyft was/is paying the referral money to the wrong Ambassadors/Drivers.

145.   Lastly, Lyft inaccurately charged Koenig "tolls" or other miscellaneous fees, which Lyft deducted from Plaintiffs' accounts, without any justification.

23

146. As Lyft has credited the wrong Driver/Ambassadors for Plaintiffs' services and because Lyft has over the years engaged in a practice of disabling, or most recently deactivating Plaintiffs' Dashboards, Plaintiffs are not able to accurately determine the amount of money Lyft owes to Plaintiffs pursuant to the terms of the Driver Terms and Ambassador Terms.

WHEREFORE, Plaintiffs Jill Koenig, Beth Kingsbury, and Savannah Williams respectfully request that this Court enter an Order requiring Defendant Lyft to produce an accounting of any and all amounts due to Plaintiffs, including but not limited to a full accounting of the number of people who redeemed Plaintiffs' Ride Codes and what account received credit for the Ride Code redemption, including Ride Codes that were redeemed while the Plaintiffs' Driver and Ambassador Dashboards were disabled and/or while Plaintiffs have been deactivated.

## COUNT IV-TORTIOUS INTERFERENCE WITH A PROSPECTIVE ECONOMIC ADVANTAGE
### (Plaintiffs v. Lyft and Individual Defendants)

1-139 Plaintiffs re-allege paragraphs 1-133 of Allegations Common to All Counts as paragraphs 1-139 of this Count IV.

140. Upon information and belief, at all times relevant herein, the Individual Defendants were agents/and or employees of Lyft and in doing the conduct alleged of in this Complaint were acting within the course and scope of such agency/employment relationship.

141. As stated above, the Individual Defendants would (1) stand directly in front of Plaintiffs while Plaintiffs attempted to pass out their Ride Codes, effectively upstreaming Plaintiffs; (2) harass Plaintiffs on the street by engaging in intimidating and aggressive behavior, which would deter pedestrians from taking Plaintiffs' referral cards with the Plaintiffs' Ride Codes on them; (3) find out where the Plaintiffs were passing out their referral cards, show up at the same location, surround the Plaintiffs, and begin passing out their own referral cards with the

24

Individual Defendants' Ride Codes on them; (4) tell potential referrals the Plaintiffs' Ride Codes did not work or that the Individual Defendants' Ride Codes were better; and (5) otherwise interfere with the Plaintiffs ability to get the Plaintiffs' referral codes into the hands of prospective referrals.

142. When Plaintiffs passed out their referral cards without the Individual Defendants' interference, many potential referrals would eagerly grab the cards from the Plaintiffs.

143. Plaintiffs noticed that the number of cards they passed out on any given day directly correlated to the number of people that "redeemed" their Ride Codes and signed up to be Riders or Drivers.

144. Therefore, the Plaintiffs' compensation was directly correlated to the number of referral cards they were able to pass out at any given time.

145. When Plaintiffs would promote Lyft on the street and pass out their referral cards, Plaintiffs had a reasonable expectation of entering into a valid business relationship, whereby the pedestrians/potential referrals would "redeem" their Ride Codes and trigger the compensation portion of the Ambassador Terms.

146. As the Individual Defendants were also Lyft Ambassadors and Drivers, the Individual Defendants had knowledge that Plaintiffs expected that a number of the potential referrals would redeem the Ride Codes passed out to them on the street.

147. In spite of this, the Individual Defendants unjustly, maliciously and purposefully interfered with the Plaintiffs' efforts to get their Ride Codes in the hands of the potential referrals, thereby preventing the Plaintiffs legitimate expectancy to be paid pursuant to the Ambassador Terms from ripening.

148.    Due to the Individual Defendants' interfering conduct, Plaintiffs have been damaged, in that they have experienced a dramatic decrease in the amount of redemptions since the Individual Defendants began interfering with Plaintiffs' work, despite the fact that Plaintiffs were (or attempted to be) on the street promoting as often and as aggressively as they were prior to Defendants' conduct.

WHEREFORE, Plaintiffs Jill Koenig, Beth Kingsbury, and Savannah Williams respectfully request that this Court enter a judgment in Plaintiffs favor and against Defendant Lyft for vicarious liability and Defendants Allison Clark, Keegan Kok, Mattia Nanfria, Emma Fine, Lamont Campbell, David Todd , Christopher Wojnar, and Michael Elrod:

(A)    Finding that Defendants intentionally interfered with Plaintiffs' prospective economic advantages;

(B)    Entering a monetary judgment against Defendants individually for the amount of damage Plaintiffs demonstrate at trial;

(C)    For punitive damage damages in an amount to be determined by the Court;

(D)    For attorneys' fees and costs as this Court deems appropriate under the circumstances.

## COUNT V-WRONGFUL SUSPENSION/DISCHARGE
### (Plaintiffs v. Lyft)

1-139  Plaintiffs re-allege paragraphs 1-133 of Allegations Common to All Counts as paragraphs 1-139 of this Count V.

140.    In and around October of 2016, Lyft deactivated Plaintiffs' Lyft Driver and Ambassador Accounts.

141.    This effectively terminated Plaintiffs contract with Lyft as they are no longer able to perform services as Drivers or Ambassadors.

142. Plaintiffs termination was a direct retaliation for the Plaintiffs' legal activities of (1) internally reporting to Lyft that certain employees at Lyft were manipulating Plaintiffs Dashboards because they were high earners or associated with high earners in an attempt to keep compensation down; and (2) reporting fellow Lyft Ambassador and Driver's unlawful conduct to the Chicago police authorities.

143. Lyft's discharge of Plaintiffs is a violation of a clear mandate of public policy, in that Plaintiffs were terminated for reporting illegal conduct.

WHEREFORE, Plaintiffs Jill Koenig, Beth Kingsbury, and Savannah Williams pray that judgment be entered in their favor and against Defendant Lyft, for all relief necessary to make the Plaintiffs whole, including but not limited to the following, as appropriate:

(A) Immediate re-activation of Plaintiffs Dashboard and reinstatement as Lyft Drivers and Ambassadors;

(B) Compensation for damages sustained as a result of the violation, with interest;

(C) Compensatory damages; and

(D) Litigation costs and fees, and reasonable attorney's fees.

## COUNT VI- DEFAMATION PER SE
### (Plaintiffs v. Lyft and Individual Defendants)

1-139 Plaintiffs re-allege paragraphs 1-133 of Allegations Common to All Counts as paragraphs 1-139 of this Count VI.

140. Upon information and belief, at all times relevant herein, the Individual Defendants were agents/and or employees, and/or contractors of Lyft and in doing the conduct alleged of in this Complaint were acting within the course and scope of such agency/employment relationship.

27

141. In and around May of 2016 to at least October of 2016, the Individual Defendants intentionally and maliciously published on the Heavy Lyfter's Group page, a page that can be accessed by over 1000 people, false statements that Plaintiffs were (1) committing criminal offenses (harassment and assault); (2) unable to honestly perform their duties as Ambassadors for Lyft; (3) associated with homeless people that commit assault; and (4) otherwise making prejudicial statements about Plaintiffs' professionalism and business practices.

142. Upon information and belief, the Individual Defendants made similar false and damaging statements online in other social media groups.

143. Also, upon information and belief, the Individual Defendants made false verbal accusations to Lyft managers and personnel concerning Plaintiffs' honesty, professionalism, and ability to honestly perform their jobs as Drivers and Ambassadors.

144. The Individual Defendants' statements caused harm to the Plaintiffs' reputation, in that the statements lowered Plaintiffs in the eyes of the community, especially the Lyft community.

145. Due to the Individual Defendants' statements, both verbal and written, other Lyft Ambassadors, who would routinely greet Plaintiffs or otherwise promote with the Plaintiffs, refused to interact and associate with Plaintiffs.

146. In addition, due to the Individual Defendants' false statements, both verbal and written, Plaintiffs were excluded from elite and/or exclusive Lyft events—events that Plaintiffs all once were a part of.

147. As a result, Plaintiffs have been harmed in the form of loss business opportunities, loss of reputation in the community, loss compensation, as well as personal humiliation and distress.

28

148. Lyft was aware of the damaging and false statements being made about Plaintiffs on the Lyft endorsed and promoted platforms, as Plaintiffs informed Lyft on numerous occasions via phone and email, yet Lyft did nothing to remove the platforms or otherwise prohibit, deter or remove the false and damaging statements.

WHEREFORE, Plaintiffs Jill Koenig, Beth Kingsbury, and Savannah Williams respectfully request that this Court enter a judgment in Plaintiffs favor and against Defendant Lyft for vicarious liability and Defendants Allison Clark, Keegan Kok, Mattia Nanfria, Emma Fine, Lamont Campbell, David Todd, Christopher Wojnar, and Michael Elrod:

(A) Finding that Defendants intentionally defamed Plaintiffs;

(B) Entering a monetary judgment against Defendants individually for the amount of damage Plaintiffs demonstrate at trial;

(C) For punitive damage damages in an amount to be determined by the Court;

(D) For attorneys' fees and costs as this Court deems appropriate under the circumstances.

## COUNT VII-ASSAULT
### (Plaintiffs v. Lyft and Individual Defendants)

1-139 Plaintiffs re-allege paragraphs 1-133 of Allegations Common to All Counts as paragraphs 1-139 of this Count VII.

140. Upon information and belief, at all times relevant herein, the Individual Defendants were agents/and or employees of Lyft and in doing the conduct alleged of in this Complaint were acting within the course and scope of such agency/employment relationship.

141. As alleged above, the Individual Defendants, would intentionally engage in intimidating and aggressive behavior towards the Plaintiffs by jumping out of cars and aggressively approaching Plaintiffs, standing inches within Plaintiffs faces, pointing their fingers

29

and shaking their hands in Plaintiffs' faces, making threatening moves towards Plaintiffs, verbally attacking Plaintiffs, and otherwise approaching Plaintiffs in a threatening manner.

142.    On various occasions, the Individual Defendants engaged in such threatening behavior that Plaintiffs had to cease working that day and leave the area that they intended to promote for the day.

143.    On one occasion, Todd confronted Williams and Koenig in a threatening manner and Koenig attempted to back away from Todd so that he would not touch her without her permission.

144.    Todd persisted to follow Koenig down the street, stand directly in her face and forcing Koenig so that her back was to a wall.

145.    Koenig felt so threated by this conduct that she had to pull out mace and threaten to call 911 in order to deter Todd from getting any closer and/or inflicting harm on Williams and Koenig.

146.    This is but one example of the Individual Defendants' threatening conduct towards Plaintiffs.

147.    At no times herein did Plaintiffs consent to any of the Individual Defendants' intimidating and aggressive behavior.

148.    The Individual Defendants' engaged in the above-referenced behavior with the intent to harm and/or frighten Plaintiffs.

149.    The Individual Defendants' actions and gestures created apprehension in the Plaintiffs and caused Plaintiffs to think that they were being surrounded and likely subject to imminent offensive and harmful conduct.

150. Plaintiff experienced damages that were proximately caused by the Individual Defendants conduct, in that Plaintiffs' suffered extreme mental anguish and anxiety.

151. As a further direct and proximate result of the Individual Defendant's conduct, Plaintiffs were unable to work as Ambassadors and, accordingly, Plaintiffs lost commissions in an amount to be determined by proof at trial.

WHEREFORE, Plaintiffs Jill Koenig, Beth Kingsbury, and Savannah Williams respectfully request that this Court enter a judgment in Plaintiffs favor and against Defendant Lyft for vicarious liability and Defendants Allison Clark, Keegan Kok, Mattia Nanfria, Emma Fine, Lamont Campbell, David Todd , Christopher Wojnar, and Michael Elrod:

(A) Finding that Defendants intentionally assaulted Plaintiffs;

(B) Entering a monetary judgment against Defendants individually for the amount of damage Plaintiffs demonstrate at trial;

(C) For punitive damage damages in an amount to be determined by the Court;

(D) For attorneys' fees and costs as this Court deems appropriate under the circumstances.

## COUNT VIII-CONSPIRACY
### (Plaintiffs v. Lyft and Individual Defendants)

1-139 Plaintiffs re-allege paragraphs 1-133 of Allegations Common to All Counts as paragraphs 1-139 of this Count VIII.

140. The Individual Defendants and Lyft combined together in a covert manner for the purpose of (1) interfering with Plaintiffs' potential business advantages by boxing in and upstreaming Plaintiffs and otherwise obstructing Plaintiffs' ability to pass out their referral cards to potential referrals on the street; (2) harassing and assaulting Plaintiffs so that they would feel so uncomfortable on the street they would have to discontinue passing out their referral cards; (3)

defaming Plaintiffs so that other members of the community would not want to be associated with or assist Plaintiffs in carrying out their duties as Lyft Ambassadors; (4) obstructing Plaintiffs abilities to earn money by working as Ambassadors in an attempt to keep compensation down.

141.  In furtherance of these purposes, the Individual Defendants committed overt tortious and unlawful acts of assault, battery, tortious interference with potential economic advantages, and defamation, among others.

142.  The Individual Defendants knowingly and voluntarily participated in the common scheme to interfere with Plaintiffs' attempts to earn money as Ambassadors.

143.  Lyft also knowingly and voluntarily participated in the common scheme to keep Plaintiffs' compensation down by disclosing Plaintiffs' earnings to other Ambassadors and Drivers in an attempt to conjure up jealousy and resentment towards the Plaintiffs.

144.  Upon information and belief Lyft also encouraged and rewarded the Individual Defendants for their obstructive and unlawful conduct.

WHEREFORE, Plaintiffs Jill Koenig, Beth Kingsbury, and Savannah Williams respectfully request that this Court enter a judgment in Plaintiffs favor and against Defendant Lyft and Defendants Allison Clark, Keegan Kok, Mattia Nanfria, Emma Fine, Lamont Campbell, David Todd, Christopher Wojnar, and Michael Elrod:

(A)  Finding that Defendants intentionally engaged in a conspiracy against Plaintiffs;

(B)  Entering a monetary judgment against Defendants individually for the amount of damage Plaintiffs demonstrate at trial;

(C)  For punitive damage damages in an amount to be determined by the Court;

(D)  For attorneys' fees and costs as this Court deems appropriate under the circumstances.

<u>COUNT IX- VIOLATIONS OF ILLINOIS STALKING ACT</u>
<u>740 ILCS 21/80</u>
(Plaintiffs v. Individual Defendants)

1-139   Plaintiffs re-allege paragraphs 1-133 of Allegations Common to All Counts as paragraphs 1-139 of this Count IX.

140.   Over the course of a year, and on more than 10 separate occasions, the Individual Defendants engaged in the following behavior: (1) following Plaintiffs and confronting Plaintiffs while they were on the streets of Chicago attempting to promote Lyft; (2) conducting surveillance on Plaintiffs so that they would know when and where Plaintiffs where on the streets passing out their referral cards; (3) appearing where Plaintiffs were working and obstructing their ability to promote Lyft and pass out their referral cards; (4) sending unwanted messages to Plaintiffs threatening to "out" them and harass them.

141.   As a result of the Individual Defendants' conduct, Plaintiffs verify and affirm (pursuant to the Verifications attached hereto), that they feared for their safety and suffered emotional distress.

142.   As a result of the Individual Defendants conduct, Plaintiffs suffered from anxiety and feared that they would be aggressively approached, assaulted, or harassment while they were attempting to carry out their jobs as Ambassadors.

143.   Plaintiffs altered their daily routines and left the streets where they were promoting in an attempt to avoid the Individual Defendants who are stalking and bothering them.

144.   As victims of the Individual Defendants' stalking behavior, Plaintiffs seek stalking NO contact orders from this Court.

WHEREFORE, Plaintiffs Jill Koenig, Beth Kingsbury, and Savannah Williams respectfully request that this Court enter a stalking NO Contact Order against Defendants Allison

Clark, Keegan Kok, Mattia Nanfria, Emma Fine, Lamont Campbell, David Todd, Christopher

Wojnar, and Michael Elrod;

(1) Prohibiting the Individual Defendants from threatening to commit or committing stalking;

(2) Ordering the Individual Defendants not to have any contact with the Plaintiffs;

(3) Prohibit the Individual Defendants from knowingly coming within, or knowingly remaining within a specified distance of the Plaintiffs' residence, place of employment, where Plaintiffs are on the streets working as Ambassadors, promoting Lyft, an/or passing out their referral cards, any other specified places frequented by the Plaintiffs;

(4) Ordering any other injunctive relief the Court determines to be necessary under the circumstances; and

(5) Awarding the Plaintiffs allowable costs and attorney's fees pursuant to 740 ILCS 21/80.

## COUNT X- VIOLATION OF THE FAIR LABOR STANDARDS ACT
### (Plaintiffs, and all other similarly situated Plaintiffs v. Lyft)

1-139 Plaintiffs re-allege paragraphs 1-133 of Allegations Common to All Counts as

paragraphs 1-139 of this Count X.

140. This count arises from Defendants' violation of the Fair Labor Standards Act, 29

U.S.C. § 201, *et seq.* ("FLSA"), for Lyft's failure to pay wages and overtime wages earned by

Plaintiffs, and to other similarly situation employees of Lyft.

141. Plaintiffs bring this case as a collective action under the FLSA; in accord with

section 16(b) of the FLSA, the Plaintiffs have given written consent to bring such an action. See

**Exhibit 18.**

142. Upon information and belief, at all times relevant to this action, Lyft

exercises/exercised significant control over Plaintiffs' day to day operations and how they were

able to carry out their duties as Drivers and Ambassadors.

34

143.    Plaintiffs have worked for Lyft and were "employee(s)" of Lyft as defined by section 3(e)(1) of the FLSA, 29 U.S.C. § 203(e)(1).

144.    Lyft was Plaintiffs' "employer" within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

145.    Plaintiffs were directed to work for Lyft and they did work for Lyft, sometimes in excess of 40 hours per week, throughout the tenure of their employment.

146.    Plaintiffs' work for Lyft affected commerce within the state of Illinois and nationwide.

147.    Pursuant to 29 U.S.C. § 207, for all the weeks during with Plaintiffs worked in excess of 40 hours, Plaintiffs were entitled to compensation.

148.    Lyft did not compensate Plaintiffs for the work performed, including the work performed in excess of 40 hours per week.

149.    Lyft's failure to pay Plaintiffs wages, including overtime wages for time worked in excess of 40 hours per week, was a violation of the Fair Labor Standards Act.

WHEREFORE, Plaintiffs Jill Koenig, Beth Kingsbury, and Savannah Williams respectfully request a judgment in Plaintiffs favor and against Defendant Lyft as follows:

(A)     Monetary judgment in an amount to be determined at trial for lost wages;

(B)     Reasonable attorney's fees and cost incurred in filing this action;

(C)     Such other and further relief as this Court deems appropriate and just.

## COUNT XI-VIOLATIONS OF ILLINOIS WAGE PAYMENT AND COLLECTION ACT
### (Plaintiffs and all other similarly situated Plaintiffs v. Lyft)

1-139   Plaintiffs re-allege paragraphs 1-133 of Allegations Common to All Counts as paragraphs 1-139 of this Count XI.

140. The matters set forth in this count arise from Defendant Lyft's violation of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et. seq.*, for Lyft's failure to pay Plaintiffs commissions earned. 820 ILCS 115/3.

141. Plaintiffs bring this case as a collective action under the FLSA; in accord with section 16(b) of the FLSA, the Plaintiffs have given written consent to bring such an action. See Exhibit 17.

142. Upon information and belief, at all times relevant to this action, Lyft exercises/exercised significant control over Plaintiffs' day to day operations and how they were able to carry out their duties as Drivers and Ambassadors.

143. At all relevant times herein, Plaintiffs have worked for Lyft and where "employee(s)" of Lyft as Defined by Section 115 § 2 of the Illinois Wage Payment and Collection Act.

144. Lyft was Plaintiffs' "employer" within the meaning of Section 115 § 2 of the Illinois Wage Payment and Collection Act.

145. Plaintiffs were directed to work for Lyft and they did work for Lyft, sometimes in excess of 40 hours per week, throughout the tenure of their employment.

146. Plaintiffs' work for Lyft affected commerce within the state of Illinois and nationwide.

147. Pursuant to 820 Ill. ILCS 115/3, Plaintiffs are entitled to compensation for the wages earned during their tenure as employees for Lyft.

148. Lyft did not compensate Plaintiffs for the work performed, including the work performed in excess of 40 hours per week.

36

149.    Lyft's failure to pay Plaintiffs wages, including overtime wages for time worked in excess of 40 hours per week, was a violation of the Illinois Wage Payment and Collection Act.

WHEREFORE, Plaintiffs Jill Koenig, Beth Kingsbury, and Savannah Williams respectfully request a judgment in Plaintiffs favor and against Defendant Lyft as follows:

(A)    Monetary judgment in an amount to be determined at trial for lost wages;

(B)    Reasonable attorney's fees and cost incurred in filing this action;

(C)    Such other and further relief as this Court deems appropriate and just.

Respectfully submitted,

BETH KINGSBURY, JILL KOENIG,
SAVANNAH WILLIAMS, and all other similarly
situated Plaintiffs,

By: _____
One of their Attorneys

L. Steven Platt
Christine R. Frymire
Robbins, Salomon & Patt, Ltd.
180 N. LaSalle St. Ste. 3300
Chicago, Illinois 60601
(312) 782-9000
email: lsplatt@rsplaw.com
email: cfrymire@rsplaw.com
Firm ID No. 80919

STATE OF ILLINOIS     )
                      ) ss.
COUNTY OF COOK        )

### VERIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this Verified Complaint for Injunctive and Other Relief, true and correct to the best of her knowledge, except as to matters that involve legal conclusions, matters stated on information and belief and as to such matters where the undersigned certifies as aforesaid that she verily believes the same to be true.

JILL KOENIG,

STATE OF ILLINOIS       )
                                ) ss.
COUNTY OF COOK      )

## VERIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this Verified Complaint for Injunctive and Other Relief, true and correct to the best of her knowledge, except as to matters that involve legal conclusions, matters stated on information and belief and as to such matters where the undersigned certifies as aforesaid that she verily believes the same to be true.

SAVANNAH WILLIAMS,

STATE OF ILLINOIS     )
                          ) ss.
COUNTY OF COOK     )

## VERIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this Verified Complaint for Injunctive and Other Relief, true and correct to the best of her knowledge, except as to matters that involve legal conclusions, matters stated on information and belief and as to such matters where the undersigned certifies as aforesaid that she verily believes the same to be true.

BETH KINGSBURY

# EXHIBIT 1

# Lyft Terms of Service

May 22, 2014

This following user agreement describes the terms and conditions on which Lyft, Inc. offers you access to the Lyft platform.

Welcome to the user agreement (the "Agreement" or "User Agreement" or "Terms of Service") for Lyft (the "Lyft Platform"), an application owned and operated by Lyft Inc., a Delaware corporation, whose principal office is located at

548 Market St #68514, San Francisco, CA 94104

. This Agreement is a legally binding agreement made between you ("You," "Your," or "Yourself") and Lyft, Inc. ("Lyft," "We," "Us" or "Our").

Lyft is willing to license, not sell, the Lyft Platform to You only upon the condition that You accept all the terms contained in this Agreement. By signing up with or by using the Lyft Platform, You indicate that You understand this Agreement and accept all of its terms. If You do not accept all the terms of this Agreement, then Lyft is unwilling to license the Lyft Platform to You,

This paragraph applies to any version of the Lyft Platform that you acquire from the Apple App Store. This Agreement is entered into between You and Lyft. Apple, Inc. ("Apple") is not a party to this Agreement and shall have no obligations with respect to the Lyft Platform. Lyft, not Apple, is solely responsible for the Lyft Platform and the content thereof as set forth hereunder. However, Apple and Apple's subsidiaries are third party beneficiaries of this Agreement. Upon Your acceptance of this Agreement, Apple shall have the right (and will be deemed to have accepted the right) to enforce this Agreement against You as a third party beneficiary thereof. This Agreement incorporates by reference the Licensed Application End User License Agreement published by Apple, for purposes of which, You are "the end-user." In the event of a conflict in the terms of the Licensed Application End User License Agreement and this Agreement, the terms of this Agreement shall control.

The Lyft Platform provides a means to enable persons who seek transportation to certain destinations ("Riders") to be matched with persons driving to or through those destinations ("Drivers"). For purposes of this Agreement these services shall collectively be defined as the "Services". This Agreement describes the terms and conditions that will govern Your use of and participation in the Lyft Platform.

Please read this Agreement carefully before using the Services, You must read, agree with and accept all of the terms and conditions contained in this Agreement, which includes those terms and conditions expressly set out below and those incorporated by reference, before You use any of the Services. By using any of the Services, You become a Participant in Lyft and a User of Services available on the Lyft Platform ("Participant" or "User") and You agree to be bound by the terms and conditions of this Agreement with respect to such Services.

If you do not agree to be bound by the terms and conditions of this agreement, please do not use or access Lyft or register for the services provided on Lyft. We may amend this Agreement at any time by posting the amended terms on the Lyft Platform. If We post amended terms on the Lyft Platform, You may not use the Services without accepting them. Except as stated below, all amended terms shall automatically be effective after they are posted on the Lyft Platform. This Agreement may not be otherwise amended except in writing signed by You and Lyft.

Lyft does not provide transportation services, and Lyft is not a transportation carrier. It is up to the driver or vehicle operator to decide whether or not to offer a ride to a rider contacted through the Lyft Platform, and it is up the rider to decide whether or not to accept a ride from any driver contacted through the Lyft platform. Any decision by a user to offer or accept transportation once such user is matched through the Lyft Platform is a decision made in such user's sole discretion. Lyft offers information and a method to connect drivers and riders with each other, but does not and does not intend to provide transportation services or act in any manner as a transportation carrier, and has no responsibility or liability for any transportation services voluntarily provided to any rider by any driver using the Lyft Platform.

## Payments

- Donations (applicable to all users outside California). As a Rider outside California, You may elect to make a voluntary donation ("Donation") for the ride a Driver has provided to You. The decision whether to make a Donation and the amount of the Donation is at Your sole discretion, and the Driver will not receive

any compensation or consideration for providing You a ride other than the amount (if any) of this voluntary Donation. As a Driver, You may receive from a Rider a Donation for the ride You have provided. Each Driver acknowledges that the decision to provide such Donation and the amount of the Donation is at the Rider's sole discretion, and that the Driver will not request from Rider or receive any compensation or consideration for providing a ride to the Rider other than the amount (if any) of the Donation. A Donation may be any amount from $0 up, as specified by Rider. If, within twenty-four (24) hours after a completion of a ride, a Rider does not identify a specific Donation amount for such ride, or decline to donate by specifying $0 as the Donation amount, Lyft will assume that the Rider selects the suggested Donation amount for the ride and the Rider's credit card will automatically be charged that amount. It is the rider's sole responsibility, and not the responsibility of Lyft, to decide whether and how much to donate to the driver.

• Charges (applicable to California users only). As a Rider in California, You agree that any mandatory amounts charged following a ride (a "Charge") are due immediately. Lyft reserves the right to determine pricing.

• Administrative Fee. Lyft receives an administrative fee of up to 20% (the "Administrative Fee") of each

1. Charge (California only)
2. Donation of more than $0 (users outside California) that a Rider makes to a Driver, net of the $1 per ride trust & safety fee (the "Trust & Safety Fee").

For the sake of clarity, the Administrative Fee is assessed on a Donation or Charge, as applicable, after the assessment of the Trust & Safety Fee.

• Refunds. The full amount of the Donation or Charge, as applicable (including the Administrative Fee), is charged immediately following completion of such election to the Rider's authorized credit card and transferred (less the Administrative Fee) to such Driver's account. All payments made are non-refundable. This no-refund policy shall apply at all times regardless of a Rider's decision to terminate usage of Lyft, our decision to terminate a Rider's usage, disruption caused to our Services either planned, accidental or intentional, or any other reason whatsoever.

• Promotional Offers. Lyft, at its sole discretion, may make available promotional offers with different features to any of our customers. These promotional offers, unless made to You, shall have no bearing whatsoever on Your offer or contract. Lyft may change its Administrative Fee as we deem necessary for our business. We encourage You to check this Agreement periodically if You are interested in keeping abreast of the rate of our Administrative Fee.

• Cancellation Fee. In the event that a Rider cancels a ride request on the Lyft Platform more than 5 minutes after such request is made, Rider agrees to pay a "Cancellation Fee" of $5.

• Damage Fee. In the event that a Driver reports to Lyft that a Rider has in any manner materially damaged the Driver's vehicle, Rider agrees to pay a "Damage Charge" of either $100 or $250 depending on the extent of the damage (as determined by Lyft in its sole discretion), which shall constitute full payment for Driver's cost of repairing or cleaning the vehicle, or otherwise remediating the damage. The Damage Charge shall be transferred to Driver. Lyft reserves the right (but is not obligated) to verify or otherwise require documentation of damages prior to processing the Damage Charge.

• Facilitation of Payments. All Donations or Charges, as applicable, shall be facilitated through Stripe, Inc., Lyft's third-party payment processing service.

## Insurance

Lyft procures an insurance policy that provides Drivers with excess automobile liability insurance up to $1,000,000 per occurrence. The policy offers excess liability protection over a Driver's existing insurance while such Driver is transporting Rider(s) on a trip arranged through the Lyft Platform. The policy coverage is limited to liability only and does not provide coverage for collision, comprehensive or wear and tear damage to a Driver's vehicle. As with any automobile insurance policy, additional insurance terms, limitations, and exclusions apply. We do not procure insurance for, nor are we responsible for, personal belongings left in the car by Driver(s) or Rider(s).

This is an unofficial summary of Lyft's master insurance policy and may not always be up-to-date. None of the statements in this section should be interpreted as binding and are provided for quick reference only.

## California Public Utilities Commission Disclosure

Lyft facilitates rides between passengers and private drivers using their own personal vehicles. Lyft is required to maintain an insurance policy providing a minimum of $1,000,000 (one million dollars) per-incident coverage for incidents involving vehicles and drivers while they are using the Lyft Platform.

## Eligibility

Our Services are available only to, and may only be used by individuals who can form legally binding contracts under applicable law. Without limiting the foregoing, Our Services are not available to children (persons under the age of 18) or to temporarily or indefinitely terminated Participants. By becoming a Participant, You represent and warrant that You are at least 18 years old. By using the Lyft Platform or the Services, You represent and warrant that You have the right, authority and capacity to enter into this Agreement and to abide by the terms and conditions of this Agreement.

You are the sole authorized user of Your account. You are responsible for maintaining the confidentiality of any password provided by You or Lyft for accessing the Services. You are solely and fully responsible for all activities that occur under Your password or account. Lyft has no control over the use of any User's account and expressly disclaims any liability derived therefrom. Should You suspect that any unauthorized party may be using Your password or account or You suspect any other breach of security, You will contact Us immediately.

## Term and Termination

This Agreement is effective upon use of the Lyft Platform or the Services for new Users and upon the posting dates of any subsequent amendments to this Agreement for all current Users. You may terminate Your participation in the Services at any time, for any reason upon receipt by Us of Your written or email notice of termination. Either You or We may terminate Your participation in the Lyft Platform by removing Your Information at any time, for any or no reason, without explanation, effective upon sending written or email notice to the other party. Upon such termination, We will remove all of Your information from Our servers, though We may retain an archived copy of records We have about You as required by law or for legitimate business purposes. We maintain sole discretion to bar Your use of the Services in the future, for any or no reason. Even after Your participation in the Lyft Platform is terminated, this Agreement will remain in effect.

## Your Information

Your Information is any information You provide, publish or display ("post") to the Lyft Platform or send to other Users in the registration or in any public message area (including, but not limited to the feedback section) or through any email feature ("Your Information"). Your Information will be stored on computers. You consent to Us using Your Information to create a User account that will allow You to participate in the Services. You are solely responsible for Your Information and Your interactions with other people in the public, and We act only as a passive conduit for Your online posting of Your Information. When You use the Lyft Platform, You agree to provide accurate, current and complete information as prompted by Our registration form and to maintain and timely update Your Information to keep it accurate, current and complete at all times during the Term of the Agreement. You agree that We and other people of the public may rely on Your Information as accurate, current and complete. You acknowledge that if Your Information is untrue, inaccurate, not current or incomplete in any respect, We have the right to terminate this Agreement and Your use of the Services.

By accepting this Agreement, a Driver agrees that We may obtain information about the Driver, including without limitation the Driver's driving record, references and credit information. A Driver hereby authorizes Us to perform a background check on Driver, and further agrees to provide any necessary authorization to facilitate Our access to the Driver's official driving record, references and credit information during the term of the Agreement.

## Social Media and Networking Sites

As part of the functionality of the Lyft Platform, You may be able to login through online accounts You may have with third party service providers (each such account, a "Third Party Account") by either:

1. providing Your Third Party Account login information through the Lyft Platform; or
2. allowing Lyft to access Your Third Party Account, as is permitted under the applicable terms and conditions that govern Your use of each Third Party Account.

You represent that You are entitled to disclose Your Third Party Account login information to Lyft and/or grant Lyft access to Your Third Party Account (including, but not limited to, for use for the purposes described herein), without breach by You of any of the terms and conditions that govern Your use of the applicable Third Party Account and without obligating Lyft to pay any fees or making Lyft subject to any usage limitations imposed by such third party service providers. By granting Lyft access to any Third Party Accounts, You understand that

1. Lyft may access, make available and store (if applicable) any content that You have provided to and stored in Your Third Party Account (the "SNS Content") so that it is available on and through the Lyft Platform via Your account, including without limitation any friend, contacts or following/followed lists, and
2. Lyft may submit and receive additional information to Your Third Party Account as indicated herein.

Unless otherwise specified in this Agreement, all SNS Content, if any, shall be considered to be Your Information and Your Content for purposes of this Agreement. Depending on the Third Party Accounts You choose and subject to the privacy settings that You have set in such Third Party Accounts, personally identifiable information that You post to Your Third Party Account or associated service becomes through the Lyft Platform. Please note that if a Third Party Account or associated service becomes unavailable or the Lyft Platform's access to such Third Party Account is terminated by the third party service provider, then SNS Content may no longer be available on and through the Lyft Platform. Please note that your relationship with the third party service providers associated with your third party accounts is governed solely by your agreement(s) with such third party service providers. Lyft makes no effort to review any SNS Content for any purpose, including but not limited to, for accuracy, legality or non-infringement, and Lyft is not responsible for any SNS Content.

## Driver Representations and Warranties

By using the Service, a Driver represents, warrants and agrees that:

- Such Driver is at least 21 years of age.
- Such Driver possesses a valid driver's license and is authorized to operate a motor vehicle and has all appropriate licenses, approvals and authority to provide transportation to third parties in all jurisdictions in which such Driver uses the Services.
- Such Driver owns, or has the legal right to operate, the vehicle such Driver uses when accepting Riders, and such vehicle is in good operating condition and meets the industry safety standards and all applicable statutory and state department of motor vehicle requirements for a vehicle of its kind.
- Such Driver is named or scheduled on the insurance policy covering the vehicle such Driver uses when accepting Riders.
- Such Driver has a valid policy of liability insurance (in coverage amounts consistent with all applicable legal requirements) for the operation of such Driver's vehicle to cover any anticipated losses related to such Driver's provision of rides to Riders.
- Such Driver will be solely responsible for any and all liability which results from or is alleged as a result of the operation of the vehicle such Driver uses to transport Riders, including, but not limited to personal injuries, death and property damages.

- In the event of a motor vehicle accident such Driver will be solely responsible for compliance with any applicable statutory or department of motor vehicles requirements, and for all necessary contacts with such Driver's insurance carrier.
- Such Driver will obey all local laws related to the matters set forth herein, and will be solely responsible for any violations of such local laws.
- Such Driver will not make any misrepresentation regarding Lyft, the Lyft Platform, the Services or such Driver's status as a Driver, offer or provide transportation service for profit, as a public carrier or taxi service, charge for rides or otherwise seek non-voluntary compensation from Riders, or engage in any other activity in a manner that is inconsistent with such Driver's obligations under this Agreement.
- Such Driver will not transport a Rider on any trip arranged through the Lyft Platform which is in excess of sixty (60) miles.
- Such Driver will only accept Riders using the vehicle that has been reported to and photographed by Lyft.
- Such Driver will not discriminate or harass anyone on the basis of race, national origin, religion, gender, gender identity, physical or mental disability, medical condition, marital status, age or sexual orientation.

## *Restricted Activities*

You agree that You will use the Services in a manner consistent with any and all applicable laws and regulations. We reserve the right, but are not obligated to investigate and terminate Your participation in the Lyft Platform or the Services, or behaved in a way which could be regarded as inappropriate or whose conduct is unlawful or illegal.

1. With respect to Your participation on the Lyft Platform or through the Services, You agree that You will not:
   1. Impersonate any person or entity;
   2. "Stalk" or otherwise harass any person;
   3. Express or imply that any statements You make are endorsed by Us, without Our specific prior written consent;
   4. use any robot, spider, site search/retrieval application, or other manual or automatic device or process to retrieve, index, 'data mine', or in any way reproduce or circumvent the navigational structure or presentation of the Services or its contents;
   5. post, distribute or reproduce in any way any copyrighted material, trademarks, or other proprietary information without obtaining the prior consent of the owner of such proprietary rights;
   6. remove any copyright, trademark or other proprietary rights notices contained in the Service;
   7. interfere with or disrupt the Services or the Lyft Platform or the servers or networks connected to the Services or the Lyft Platform;
   8. post, email or otherwise transmit any material that contains software viruses or any other computer code, files or programs designed to interrupt, destroy or limit the functionality of any computer software or hardware or telecommunications equipment;
   9. forge headers or otherwise manipulate identifiers in order to disguise the origin of any information transmitted through the Service;
   10. "frame" or "mirror" any part of the Service, without Our prior written authorization or use meta tags or code or other devices containing any reference to Us or the Services or the Lyft Platform in order to direct any person to any other web site for any purpose; or
   11. modify, adapt, sublicense, translate, sell, reverse engineer, decipher, decompile or otherwise disassemble any portion of the Services or any software used on or for the Services or cause others to do so.
2. You further agree that Your Information and Your interactions on the Lyft Platform shall not:
   1. be false, inaccurate or misleading (directly or by omission or failure to update information);

2. infringe any third party's rights, including but not limited to: intellectual property rights, copyright, patent, trademark, trade secret or other proprietary rights or rights of publicity or privacy;
3. violate any law, statute, ordinance or regulation;
4. be defamatory, trade libelous, abusive, obscene, profane, offensive, sexually oriented, threatening, harassing, racially offensive or illegal material;
5. contain any offensive anatomical or sexual references, or offensive sexually suggestive or connotative language;
6. include in Your Information any telephone numbers, street addresses, last names, URL's or E-mail addresses other than where explicitly asked for it in the Your registration and profile section;
7. contain any viruses, Trojan horses, worms, time bombs, cancelbots, easter eggs or other computer programming routines that may damage, detrimentally interfere with, surreptitiously intercept or expropriate any system, data or personal information;
8. create liability for Us or cause Us to become subject to regulation as a transportation carrier or provider of taxi service; or
9. link directly or indirectly to any other web sites. You further agree that You will not transfer, use, or sell Your Lyft account and/or ID to any another party. We reserve the right, but We have no obligation, to reject any Participant that does not comply with these prohibitions.

## Proprietary Rights

Lyft owns and retains ownership in the Lyft Platform, and all intellectual property therein. Contingent upon Your compliance with the terms and conditions of this Agreement, Lyft hereby grants to You a limited, non-transferable, non-exclusive, non-assignable, revocable license to use the Lyft Platform on

1. any Android device that You own or control and/or
2. any iPhone or iPod touch that You own or control and as permitted by the Usage Rules set forth in Section 9.b. of the App Store Terms and Conditions (the 'Usage Rules").

This license does not allow You to use the Lyft Platform on any Android device, iPod touch, or iPhone that You do not own or control, and You may not distribute or make the Lyft Platform available over a network where it could be used by multiple devices at the same time. You may not rent, lease, lend, sell, redistribute or sublicense the Lyft Platform. You may not copy (except as expressly permitted by this license and the Usage Rules), decompile, reverse engineer, disassemble, attempt to derive the source code of, modify, or create derivative works of the Lyft Platform, any updates, or any part thereof (except as and only to the extent any foregoing restriction is prohibited by applicable law). Any attempt to do so is a violation of the rights of Lyft and its licensors. If You breach this restriction, You may be subject to prosecution and damages. The terms of the license will govern any upgrades provided by Lyft that replace and/or supplement the Lyft Platform, unless such upgrade is accompanied by a separate license in which case the terms of that license will govern.

You warrant and represent to Us that Your Information is posted by You and that You are the sole author of Your Information. To enable the Lyft Platform to use Your Information without violating any rights You might have in such information, You automatically grant, and You represent and warrant that You have the right to grant, to Us and other Participants, a non-exclusive, worldwide, perpetual, irrevocable, royalty-free, sub-licensable (through multiple tiers) right to exercise the copyright, publicity, and database rights You have in Your Information and Your Content, and to use, copy, perform, display and distribute such information and content to prepare derivative works of, or incorporate into other works, such information and content, in any media now known or not currently known, with respect to Your Information. Lyft will only use Your Information and Content in accordance with Our Privacy Policy. You may remove Your Content or Your Information from the Lyft Platform at any time. If You choose to remove Your Content or Your Information, the license granted above will automatically expire, however You acknowledge that Lyft may retain archived copies of Your Content. Lyft does not assert any ownership over Your Content; rather, as between Us and You, subject to the rights granted to Us in these Terms of Service, You retain full ownership of all of Your Content and any intellectual property rights or

other proprietary rights associated with Your Content. In addition, other Participants may post copyrighted information on the Lyft Platform, which has copyright protection whether or not it is identified as copyrighted. Except for that information which is in the public domain or for which You have been given permission, You will not copy, modify, publish, transmit, distribute, perform, display, or sell any such proprietary information of other Participants on the Lyft Platform.

## Information Control

Location data provided by the Lyft Platform is for basic location purposes only and is not intended to be relied upon in situations where precise location information is needed or where erroneous, inaccurate or incomplete location data may lead to death, personal injury, property or environmental damage. Neither Lyft, nor any of its content providers, guarantees the availability, accuracy, completeness, reliability, or timeliness of location data displayed by the Services. Any of Your information, including geolocational data, You upload, provide, or post on the Lyft Platform may be accessible to certain Users of the Lyft Platform. We cannot verify or guarantee the accuracy of the information Users provide Us on the Lyft Platform, and We do not control the information provided by other Users that is made available through Our system. Therefore, Lyft cannot and does not confirm each User's purported identity. You may find other User's information to be offensive, harmful, inaccurate, or deceptive. Please use caution and common sense when using the Lyft Platform. Please note that there are also risks of dealing with underage persons or people acting under false pretense. By using the Lyft Platform, You agree to accept such risks and Lyft is not responsible for the acts or omissions of users on the Lyft Platform. In order to help You evaluate with whom You are dealing, Lyft can link to a User's Facebook.com profile if they supply Us with their Facebook.com account information. We also encourage You to communicate directly with each potential Driver or Rider prior to engaging in an arranged transportation service.

## Lyft E-mail and Text Communications

E-mail communications and text messages sent from Us or through Us are designed to make Your Lyft experience more efficient. By becoming a Participant, You specifically agree to accept and consent to receiving e-mail communications and text messages initiated from Us or through Us, which include, without limitation: message notification e-mails, e-mails or text messages informing You about potential available Drivers or Riders and e-mails informing You of promotions We run and emails informing You of new and existing features We provide. Standard text messaging charges applied by Your cell phone carrier will apply to text messages We send. If You change Your mobile phone service provider, the notification service may be deactivated for Your phone number and You may need to re-enroll in the notification service. Lyft reserves the right to cancel the notification service at any time. If You do not wish to receive any of our e-mail communications or text messages, please do not use the Services.

## Intellectual Property

All intellectual property rights on the Lyft Platform and in the Services shall be owned by Us absolutely and in their entirety. These rights include and are not limited to database rights, copyright, design rights (whether registered or unregistered), trademarks (whether registered or unregistered) and other similar rights wherever existing in the world together with the right to apply for protection of the same. All other trademarks, logos, service marks, company or product names set forth in the Lyft Platform are the property of their respective owners. You acknowledge and agree that any questions, comments, suggestions, ideas, feedback or other information about the Lyft Platform or the Services ("Submissions"), provided by You to Us are non-confidential and shall become the sole property of Lyft. Lyft shall own exclusive rights, including all intellectual property rights, and shall be entitled to the unrestricted use and dissemination of these Submissions for any purpose, commercial or otherwise, without acknowledgment or compensation to You.

## Copyright Complaints and Copyright Agent

Lyft respects the intellectual property of others, and expects Users to do the same. If You believe, in good faith, that any materials on the Services infringe upon Your copyrights, please send the following information to Lyft's Copyright Agent at Lyft Inc., 548 Market St #68514, San Francisco, CA 94104:

1. A description of the copyrighted work that You claim has been infringed, including specific location on the Services where the material You claim is infringed is located. Include enough information to allow Lyft to locate the material, and explain why You think an infringement has taken place;
2. A description of the location where the original or an authorized copy of the copyrighted work exists – for example, the URL (Internet address) where it is posted or the name of the book in which it has been published;
3. Your address, telephone number, and e-mail address;
4. A statement by You that You have a good faith belief that the disputed use is not authorized by the copyright owner, its agent, or the law;
5. A statement by You, made under penalty of perjury, that the information in Your notice is accurate, and that You are the copyright owner or authorized to act on the copyright owner's behalf; and
6. An electronic or physical signature of the owner of the copyright or the person authorized to act on behalf of the owner of the copyright interest.

## Indemnity

You will defend, indemnify, and hold Us and Our officers, directors, employees, agents and any third parties harmless for any losses, costs, liabilities and expenses (including reasonable attorneys' fees) relating to or arising out of Your use of the Service, including:

1. Your breach of this Agreement or the documents it incorporates by reference; or
2. Your violation of any law or the rights of a third party including, without limitation, Drivers, Riders, other motorists, and pedestrians, as a result of Your own interaction with such third party;
3. any allegation that any materials that You submit to Us or transmit to the Services or to Us infringe or otherwise violate the copyright, trademark, trade secret or other intellectual property or other rights of any third party;
4. Your ownership, use or operation of a motor vehicle or passenger vehicle, including Your provision of rides to Riders; and/or
5. any other activities in connection with the Services. This indemnity shall be applicable without regard to the negligence of any party, including any indemnified person.

## Online Content Disclaimer

Opinions, advice, statements, offers, or other information or content made available through the Services, but not directly by Us, are those of their respective authors, and should not necessarily be relied upon. Such authors are solely responsible for such content. We do not guarantee the accuracy, completeness, or usefulness of any information on the Services and neither do We adopt nor endorse nor are We responsible for the accuracy or reliability of any opinion, advice, or statement made by parties other than Us. Under no circumstances will We be responsible for any loss or damage resulting from anyone's reliance on information or other content posted on the Services, or transmitted to participants. We reserve the right, but We have no obligation, to monitor the materials posted in the public areas of the Services. Notwithstanding this right, You remain solely responsible for the content of the photos, profiles (including Your name, image, and likeness), messages, notes, text, information, music, video, advertisements, listings, and other content (the "Content") that You post in the public areas of the Services and in Your private e-mail messages. We shall have the right to remove any such material that in Our sole opinion violates, or is alleged to violate, the law or this agreement or which might be offensive, illegal, or that might violate the rights, harm, or threaten the safety of Users or others. E-mails sent between You and

other participants that are not readily accessible to the general public will be treated by Us as private to the extent required by applicable law.

The Lyft Platform contains (or You may be sent through the Lyft Platform or the Services) links to other web sites ("Third Party Sites") as well as articles, photographs, text, graphics, pictures, designs, music, sound, video, information, applications, software and other content or items belonging to or originating from third parties (the "Third Party Applications, Software or Content"). Such Third Party Sites and Third Party Applications, Software or Content are not investigated, monitored or checked for accuracy, appropriateness, or completeness by Us, and We are not responsible for any Third Party Sites accessed through the Lyft Platform or any Third Party Applications, Software or Content posted on, available through or installed from the Lyft Platform, including the content, accuracy, offensiveness, opinions, reliability, privacy practices or other policies of or contained in the Third Party Sites or the Third Party Applications, Software or Content. Inclusion of, linking to or permitting the use or installation of any Third Party Site or any Third Party Applications, Software or Content does not imply approval or endorsement thereof by Us. If You decide to leave the Lyft Platform and access the Third Party Sites or to use or install any Third Party Applications, Software or Content, You do so at Your own risk and You should be aware that Our terms and policies no longer govern. You should review the applicable terms and policies, including privacy and data gathering practices, of any web site to which You navigate from the Lyft Platform or relating to any applications You use or install from the Lyft Platform.

## *Other Disclaimers*

We, Our subsidiaries, officers, directors, employees and our suppliers provide the Lyft Platform and the Services on an "as is" basis and without any warranty or condition, express, implied or statutory. We do not guarantee and do not promise any specific results from use of the Lyft Platform and/or the Services. We, Our subsidiaries, officers, directors, employees and Our suppliers specifically disclaim any implied warranties of title, merchantability, fitness for a particular purpose and non-infringement. Some states do not allow the disclaimer of implied warranties, so the foregoing disclaimer may not apply to You. This warranty gives You specific legal rights and You may also have other legal rights that vary from state to state. We do not warrant that Your use of the Services will be accurate, complete, reliable, current, secure, uninterrupted, always available, or error-free, or will meet Your requirements, that any defects in the Services will be corrected, or that the Services are free of viruses or other harmful components. We disclaim liability for, and no warranty is made with respect to, connectivity and availability. We cannot guarantee that each User is at least the required minimum age, nor do We accept responsibility or liability for any content, communication or other use or access of the Lyft Platform or the Services by persons under the age of 18 in violation of this Agreement. We are not responsible or liable in any manner for any Content posted on the Lyft Platform or in connection with the Service, whether posted or caused by Users of the Lyft Platform, by Lyft, by third parties or by any of the equipment or programming associated with or utilized in the Lyft Platform or the Services. Although We provide rules for User conduct and postings, We do not control and are not responsible for what Users post, transmit or share on the Lyft Platform and are not responsible for any offensive, inappropriate, obscene, unlawful or otherwise objectionable content You may encounter on the Lyft Platform or in connection with any Content, You is not responsible for the conduct, whether online or offline, of any user of the Lyft Platform or Services. It also is possible for others to obtain personal information about You due to Your use of the Lyft Platform or the Services, and that the recipient may use such information to harass or injure You. We are not responsible for the use of any personal information that You disclose on the Lyft Platform or through the Services.

You are solely responsible for Your interactions with other Users. We reserve the right, but have no obligation, to monitor disputes between You and other Users. Please carefully select the type of information that You post on the Lyft Platform or through the Services or release to others. We disclaim all liability, regardless of the form of action, for the acts or omissions of other Participants or Users (including unauthorized users, or "hackers"). Lyft only offers a venue that enables drivers and riders to match with each other. Lyft does not offer transportation services and Lyft is not a transportation company. We are not involved in the actual transportation provided by Drivers to Riders. As a result, We have no control over the quality or safety of the transportation that occurs as a result of the Service, nor do We have any control over the truth or accuracy of the of Participants' information listed on the Lyft Platform. We cannot ensure that a Driver or Rider is who he or she claims to be or that a Driver or Rider will actually complete an arranged service. We reserve the right to change any and all Content, software

and other items used or contained in the Lyft Platform and the Services at any time without notice. Reference to any products, services, processes or other information, by trade name, trademark, manufacturer, supplier or otherwise does not constitute or imply endorsement, sponsorship or recommendation thereof, or any affiliation therewith, by Lyft or the Lyft Platform.

The Lyft Platform and the Services may be temporarily unavailable from time to time for maintenance or other reasons. Lyft assumes no responsibility for any error, omission, interruption, deletion, defect, delay in operation or transmission, communications line failure, theft or destruction or unauthorized access to, or alteration of, User communications. Lyft is not responsible for any technical malfunction or other problems of any telephone network or service, computer systems, servers or providers, computer or mobile phone equipment, software, failure of email or players on account of technical problems or traffic congestion on the Internet, on the Lyft Platform, on any web site or any combination thereof, including injury or damage to User's or to any other person's computer, mobile phone, or other hardware or software, related to or resulting from using or downloading materials in connection with the Web and/or in connection with the Services.

## Limitation of Liability

In no event will We, Our subsidiaries, officers, directors, employees or Our suppliers, be liable to You for any incidental, consequential, or indirect damages (including, but not limited to, damages for deletion, corruption, loss of data, loss of programs, failure to store any information or other content maintained or transmitted by Our services, service interruptions, or for the cost of procurement of substitute services) arising out of or in connection with Lyft, Our services or this agreement (however arising, including negligence) even if We or Our agents or representatives know or have been advised of the possibility of such damages. We do not screen the participants using the services in any way. As a result, We will not be liable for any damages, direct, indirect, incidental and/or consequential, arising out of the use of Lyft or the services, including, without limitation, to damages arising out of communicating and/or meeting with other participants of Lyft or the services, or introduced to you via Lyft or the services. Such damages include, without limitation, physical damages, bodily injury, death and or emotional distress and discomfort. Notwithstanding anything to the contrary contained herein, our liability, and the liability of Our subsidiaries, officers, directors, employees, and suppliers, to You or any third parties in any circumstance is limited to $100. Certain state laws do not allow limitations on implied warranties or the exclusion or limitation of certain damages. If these laws apply to You, some or all of the above disclaimers, exclusions or limitations may not apply to You, and You may have additional rights.

Lyft has no responsibility whatsoever for the actions or conduct of drivers or riders. Lyft has no obligation to intervene in or be involved in any way in disputes that may arise between drivers, riders, or third parties. Responsibility for the decisions you make regarding providing or accepting transportation rest solely with You. It is each rider and driver's responsibility to take reasonable precautions in all actions and interactions with any party they may interact with through use of the services. Lyft may but has no responsibility to screen or otherwise evaluate potential riders or users. Users understand and accept that Lyft has no control over the identity or actions of the riders and drivers, and Lyft requests that users exercise caution and good judgment when using the services. Drivers and riders use the services at their own risk.

## Release

In the event that You have a dispute with one or more Users, You agree to release Lyft (and Our officers, directors, agents, subsidiaries, joint ventures and employees) from claims, demands and damages (actual and consequential) of every kind and nature, known and unknown, suspected and unsuspected, disclosed and undisclosed, arising out of or in any way connected to such disputes with other Users or to Your use of the Lyft Platform or the Services. If You are a California resident, You waive California Civil Code Section 1542, which says: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which, if known by him must have materially affected his settlement with the debtor."

## Breach

Without limiting other remedies, We may terminate Your Participation, remove Your Information, warn Our community of Your actions, issue a warning, and refuse to provide Our services to You if:

1. You breach this Agreement or the documents it incorporates by reference;
2. We are unable to verify or authenticate any Information You provide to Us;
3. We believe that Your actions may cause financial loss or legal liability for You, Our users or Us, or subject Lyft or You or any other User to regulation by any state or local government or regulatory agency; or
4. If We suspect that You have engaged in fraudulent activity in connection with the Lyft Platform or the Services.

## Agreement to Arbitrate All Disputes and Legal Claims

You and We agree that any legal disputes or claims arising out of or related to the Agreement (including but not limited to the use of the Lyft Platform and/or the Services, or the interpretation, enforceability, revocability, or validity of the Agreement, or the arbitrability of any dispute), that cannot be resolved informally shall be submitted to binding arbitration in the state in which the Agreement was performed. The arbitration shall be conducted by the American Arbitration Association under its Commercial Arbitration Rules (a copy of which can be obtained here), or as otherwise mutually agreed by you and we. Any judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Claims shall be brought within the time required by applicable law. You and we agree that any claim, action or proceeding arising out of or related to the Agreement must be brought in your individual capacity, and not as a plaintiff or class member in any purported class, collective, or representative proceeding. The arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative, collective, or class proceeding. YOU ACKNOWLEDGE AND AGREE THAT YOU AND LYFT ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ACTION OR REPRESENTATIVE PROCEEDING.

## Privacy

We do not sell or rent Your Information to third parties for their marketing purposes without Your explicit consent and We only use Your Information as described in the Privacy Policy. We view protection of users' privacy as a very important community principle. We understand clearly that You and Your Information is one of Our most important assets. We store and process Your Information on computers located in the United States that are protected by physical as well as technological security devices. We use third parties to verify and certify Our privacy principles. If You object to Your Information being transferred or used in this way, please do not use or access Our Services.

## Confidentiality

You agree not to use any technical, financial, strategic and other proprietary and confidential information relating to Lyft's business, operations and properties ("Confidential Information") disclosed to You by Lyft for Your own use or for any purpose other than as contemplated herein. You shall not disclose or permit disclosure of any Confidential Information to third parties. You agree to take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information of Lyft in order to prevent it from falling into the public domain. Notwithstanding the above, You shall not have liability to Lyft with regard to any Confidential Information which You can prove:

1. was in the public domain at the time it was disclosed by Lyft or has entered the public domain through no fault of Yours;
2. was known to You, without restriction, at the time of disclosure, as demonstrated by files in existence at the time of disclosure;
3. is disclosed with the prior written approval of Lyft;

4. becomes known to You, without restriction, from a source other than Lyft without breach of this Agreement by You and otherwise not in violation of Lyft's rights; or

5. is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body; provided, however, that You shall provide prompt notice of such court order or requirement to Lyft to enable Lyft to seek a protective order or otherwise prevent or restrict such disclosure.

## No Agency

You and Lyft are independent contractors, and no agency, partnership, joint venture, employee-employer or franchisor-franchisee relationship is intended or created by this Agreement.

## Notices, Complaints

Except as explicitly stated otherwise, any notices to Lyft shall be given by certified mail, postage prepaid and return receipt requested to Lyft Inc.,
*540 Market St #68514, San Francisco, CA 94104*
, and any notices to You shall be provided to You through the Lyft Platform or given to You via the email address You provide to Lyft during the registration process. In such case, notice shall be deemed given 3 days after the date that the email was sent. Notice shall be deemed given 24 hours after email is sent, unless the sending party is notified that the email address is invalid. Alternatively, We may give You notice by certified mail, postage prepaid and return receipt requested, to the address provided to Lyft during the registration process. In such case, notice shall be deemed given 3 days after the date of mailing.

To resolve a complaint regarding the Service, You should first contact Our Customer Service Department by email at support@lyft.com. If Our Customer Service Department is not able to resolve Your complaint, You may file a complaint with the California Public Utilities Commission's Consumer Intake Unit by calling 800-894-9444.

## General

This Agreement shall be governed by the laws of the State of California without regard to choice of law principles. If any provision of this Agreement is held to be invalid or unenforceable, such provision shall be struck and the remaining provisions shall be enforced. You agree that this Agreement and all incorporated agreements may be automatically assigned by Lyft, in Our sole discretion in accordance with the "Notices" section of this Agreement. Headings are for reference purposes only and in no way define, limit, construe or describe the scope or extent of such section. Our failure to act with respect to a breach by You or others does not waive Our right to act with respect to subsequent or similar breaches. This Agreement sets forth the entire understanding and agreement between the User and Lyft with respect to the subject matter hereof. Sections referring to Services, Licenses, Liability Limit, Indemnity, and Resolution of Disputes shall survive any termination or expiration of this Agreement.

## Privacy Policy

Lyft is dedicated to protecting Your personal Information and informing You about how We use it. This privacy policy applies to transactions and activities and data gathered through the Lyft Platform. Please review this privacy policy periodically as We may revise it without notice. This privacy policy was last revised on September 10, 2012. Each time You use the Lyft Platform or provide Us with information, by doing so You are accepting the practices described in this privacy policy at that time.

## Data We Collect From You

In order to operate the Lyft Platform and to provide You with information about products or services that may be of interest to You, We may "personal information" (i.e. information that could be used to contact You directly (without using the Lyft Platform) such as full name, postal address, phone number, credit/debit card information, or email address) or "demographic information" (i.e. information that You submit, or that We collect, that is not personal information; this may include, but is not limited to, zip code,

hometown, gender, username, age/birth date, browsing history information, searching history information, and registration history information. We will also collect the contact information of Your friends, if You choose to connect Your contacts and address book information with Lyft and Your login credentials to Your social network accounts, such as Facebook and Twitter, if You choose to connect those accounts with your Lyft account. You represent and warrant that You have the authority to provide Us with any such contact information. Demographic information is divided into two categories:

1. "non-public information", which consists of ride transaction information and one-on-one communications between You and other users of the Lyft Platform; and
2. "public information", which consists of all other demographic information.

Please note that nowhere on the Lyft Platform do We knowingly collect, keep or maintain personal information from children under the age of 18, as We require that all users represent to Us that they are at least 18 years old.

## How We Use Personal Information

We use Your email address and Your other personal information to help Us efficiently operate the Lyft Platform, to contact You in connection with Your transactions and other activities on the Lyft Platform (including, but not limited to, confirmation emails, or important news that could affect Your relationship with Lyft), to forward trip information to You from other Users, to forward trip information from You to other Users, and to contact You and others to suggest potential matches. We use Your contact information to find and connect with Your friends (when instructed by You). These types of communications are known as "Operational Communications." In some cases, Operational Communications may also contain commercial messages, such as banner ads and special offers.
To operate the Lyft Platform, including processing Your transactions and supporting Your activities on the Lyft Platform, We may share Your personal information with Our agents, representatives, contractors and service providers so they can provide Us with support services such as email origination, receipt or support services, customer relationship management services, and order fulfillment. We require these entities not to use Your information for any other purpose.
By purchasing, or registering or making reservations for, products or services offered or sponsored by third parties on the Lyft Platform, or electing to receive communications (such as emails or material by mail) or electing to participate in contests, sweepstakes or other programs (such as discount or rewards programs), offered or sponsored by third parties on the Lyft Platform, You consent to Our providing Your personal information to those third parties. Those third parties may use Your personal information in accordance with their own privacy policies. You will need to contact those third parties to instruct them directly regarding Your preferences for the use of Your personal information by them. Additionally, You agree that We may use and disclose all such information so submitted to such third parties in the same manner in which We are entitled to use and disclose any other information You submit to Us.
Any third party with whom We are allowed to share Your personal information is authorized to use Your personal information in accordance with Our contractual arrangements with such third parties and in accordance with their own privacy policies, over which We have no control, and You agree that We are not responsible or liable for any of their actions or omissions. Those who contact You will need to be instructed directly by You regarding Your preferences for the use of Your personal information by them.

## How We Use Demographic Data

We may review all demographic Data. We may use public information to enable other users to search Your profile, to determine whether Your trip details fit other user's requirements, and to communicate with You. We may use demographic information to tailor the Lyft Platform and communications to Your interests. We may also share demographic information with advertisers on an anonymous and aggregated basis (i.e., without telling the advertisers Your identity). One of the reasons We may do this is to increase the likelihood that Our advertisers' goods and services will appeal to You as a user of the Lyft Platform. Our sharing of demographic information with advertisers is anonymous (i.e., We do not tell advertisers which particular Lyft Users are members of which demographic groups), subject to the rest of this privacy policy. When You respond to an advertisement, however, We ask You to remember that if

that ad that is targeted to a demographic group and You decide to give the advertiser Your personal information, then the advertiser may be able to identify You as being a member of that demographic group.

## How to Edit Your Information

Lyft provides You with the ability to access and edit Your personal information. To update Your personal Info, click Settings in the Lyft menu. There You can view, update and correct Your account information. So that We can protect the integrity of sensitive data, there are certain pieces of information, such as Your age, that You cannot alter Yourself.

Our databases automatically update any personal information You edit in Your profile, or that You request We edit. Information transmitted through boards, chats, polls or through any other means remain in Our databases and become the property of Lyft upon submission. Keep this in mind if You decide to communicate personal information through any of these applications.

## Information Retention

To preserve the integrity of Our databases, standard procedure calls for Us to retain Information submitted by members for an indefinite length of time. Lyft understands Your submissions as consent to store all Your information in one place for this indefinite length of time, if We so wish. If required by law, as is the case to comply with the Children's Online Privacy Protection Act (COPPA), We will nullify member information by erasing it from Our database. We will also respond to written member requests to nullify account information. Also, by using the Lyft Platform, You do hereby represent and warrant that You understand and agree that all information submitted by You through the Lyft Platform or otherwise to Lyft becomes the property of Lyft and may be used in the sole discretion of Lyft in accordance with this Privacy Policy and the Terms of Use.

## Choice/Opt-Out

Lyft provides Users the opportunity to opt-out of receiving communications from Us and Our partners at the point where We request information about the visitor. Lyft gives Users the option to remove their information from Our database, to not receive future communications or to no longer receive Our service.

## Special Cases in Which We Share Personal Information

Your personal information may be passed on to a third party in the event of a transfer of ownership or assets, or a bankruptcy. We may also disclose personal information when We determine that such disclosure is necessary to comply with applicable law, to cooperate with law enforcement or to protect the interests or safety of Lyft or other visitors to the Lyft Platform. We also may disclose Your personal information to Our subsidiary and parent companies and businesses, and other affiliated legal entities and businesses with whom We are under common corporate control. Whenever personal information is disclosed under this paragraph, We may also disclose Your demographic information along with it, on a non-anonymous basis. All of Our parent, subsidiary and affiliated legal entities and businesses that receive Your personal information or non-anonymous demographic information from Us will comply with the terms of this privacy policy with respect to their use and disclosure of such information.

## Our Security Precautions

Your Lyft Profile is password-protected so that only You and authorized Lyft employees have access to Your account information. If You have registered for Lyft using Facebook Connect, then Your login and password shall be the same as Your Facebook login and password. In order to maintain this protection, do not give Your password to anyone. Lyft staff will never proactively reach out to You and ask for any personal account information, including Your password If You share a computer, You should sign out of Your Lyft account and close the browser window before someone else logs on. This will help protect Your information entered on public terminals from disclosure to third parties.

Lyft makes every effort to ensure that Your information is secure on its system. Lyft has staff dedicated to maintaining Our privacy policy as set forth herein and other privacy initiatives, periodically reviewing Web

security and making sure that every Lyft employee is aware of Our security practices. Unfortunately, no data transmission over the Internet can be guaranteed to be 100% secure. As a result, Lyft cannot guarantee the security of any information You transmit to Us, and You do so at Your own risk. If You have any further questions on this issue, refer to Lyft Terms of Use. Lyft expressly disclaims any liability that may arise should any other individuals obtain the information You submit to the Lyft Platform. Lyft has security measures in place to protect against the loss, misuse and alteration of the information under Our control. Your information may be transferred to and maintained on computer networks which may be located outside of the state, province, country or other governmental jurisdiction in which You reside, and the country or jurisdiction in which these computer networks are located may not have privacy laws as protective as the laws in Your country or jurisdiction.

The Lyft Platform may contain links to other web sites. We are of course not responsible for the privacy practices of other web sites. We encourage Our Users to be aware when they leave the Lyft Platform to read the privacy statements of each and every web site that collects personally identifiable information. This Privacy Policy applies solely to information collected by the Lyft Platform.

## Changing our Privacy Policy for Previously Gathered Information

If at any point We decide to use particular personally identifiable information in a manner materially different from that stated at the time it was collected, We will notify Users by way of an email or by providing 30 days notice on the Lyft Platform. We also encourage You to review this privacy policy periodically. By using the Lyft Platform, You do hereby represent and warrant that You have read, understand and agree to all terms of Agreement. Each time You use the Lyft Platform, You agree to all terms set forth in this Agreement and any other policies published by Lyft on the Lyft Platform. Please note that We will continue to have the right to change Our privacy policy and practices, and how We use Your personally identifiable information, without notice, as described in herein, provided that such changes shall only apply to information gathered on or after the date of the change.

## Contacting Lyft

If You have any questions about this privacy statement, the practices of Lyft, or Your dealings with Lyft, You may contact Us at support@lyft.com

# EXHIBIT 2

# Lyft Ambassador Program Terms of Service

These terms of service (the "Agreement") constitute a legally binding agreement between you ("you," or "your,") and Lyft, Inc., a Delaware corporation ("Lyft," "we," "us" or "our"), governing your participation in the Lyft Ambassador Program (the "Ambassador Program").
If you do not agree to be bound by the Terms and Conditions of this Agreement, you may not provide the services (defined below) or otherwise participate in the Ambassador Program Agreement. This Agreement supersedes and replaces any and all prior versions of the Ambassador Program Agreement.

## Modifications

Lyft reserves the right to modify the terms and conditions of this Agreement or its policies relating to the Ambassador Program at any time, effective upon posting of an updated version of this Agreement on this site or the Ambassador portal. You are responsible for regularly reviewing this Agreement. If you do not agree to any of the changes you may not provide the Services or otherwise participate in the Ambassador Program. Continued participating in the Ambassador Program after any such changes shall constitute your consent to such changes.

## Services

By participating in the Ambassador Program you agree to promote Lyft and the Lyft service by the following types of activities (the "Services"): (i) generally promote usage of the Lyft Platform, including by the distribution of "Ride Codes" (defined below) to new Lyft users; (ii) identify and foster partnership opportunities for the distribution of Ride Codes to new Lyft users; (iii) execute against promotional campaigns communicated by Lyft to spread the usage of the Lyft platform in your community. A "Ride Code" is a unique alphanumeric code for you to distribute to friends, family and other third parties (each a "Referred"). Ride Codes may only be distributed for promotional purposes and must be given away free of charge. You may not sell, trade, or barter Ride Codes under any circumstances. Only new Lyft users (i.e., persons who do not already have a Lyft account) who are at least 18 years old are eligible to redeem Ride Codes and become a Referred. Ride Codes are only redeemable for use on the Lyft platform to be applied towards Lyft rides and are not transferable or redeemable for cash. To redeem the Ride Code, the Referred must enter the Ride Code on the Lyft platform in the creation of their new Lyft account. Each Ride Code is good for only one (1) ride up to a certain value set by Lyft (such value may be changed by Lyft without notice prior to redemption of the Ride Code). If the ride does not exceed the value of the Ride Code, there will be no remaining balance on the Referred's Lyft account. If the ride exceeds the value of the Ride Code, the Referred will be responsible for the payment or donation amount (if any donation is made) of the remaining balance of the ride. Ride Codes are subject to expiration and must be used within the amount of time stated by Lyft at the time of redemption, but in no event later than thirty (30) days from the date of redemption. Lyft reserves the right in its sole discretion to extend the validity of Ride Codes beyond the stated expiration date.

## Payment

In exchange for your provision of the Services, Lyft shall pay you a fee (the "Payment(s)") for each time that your unique Ride Code is "Fully Redeemed". A Ride Code shall be considered "Fully Redeemed" when the Referred (i) enters the Ride Code in the creation of their new Lyft account; and (ii) completes their first ride using the Lyft platform. A Payment shall not be considered earned until the applicable Ride Code has been Fully Redeemed.
At the time a Ride Code is Fully Redeemed, you shall earn the then-current Payment amount. The current Payment amount can be found here. The Payment amount is subject to change without notice. You are responsible for regularly reviewing this Agreement for information on the current Payment amount. If you do not agree to any of the changes to the Payment amount your sole remedy is to cease providing the Services or otherwise participating in the Ambassador Program.

## Trademark License

Lyft grants to you, during the term of this Agreement and subject to your compliance with the terms and conditions herein, a limited, revocable, non-exclusive license to display and use the trademarks LYFT, YOUR FRIEND WITH A CAR, and the Pink Mustache logo (collectively, the "Lyft Marks") solely in connection with your provision of the Services (the "License"). The License is non-transferable and non-assignable, and you shall not grant to any third party any right, permission, license or sublicense with respect to any of the rights granted hereunder without Lyft's prior written permission, which it may withhold in its sole discretion.

You acknowledge that Lyft is the owner and licensor of the Lyft Marks, and that your use of the Lyft Marks will confer no additional interest in or ownership of the Lyft Marks in you but rather inures to the benefit of Lyft. You further acknowledge that any and all goods and services displaying the Lyft Marks ("Promotional Materials") must be of sufficiently high quality to retain the value of and protect the Lyft Marks and the goodwill they represent. You understand and agree that Lyft shall have all rights of approval that are necessary to achieve this result, including without limitation the right to review and approve or reject Promotional Materials on or in connection with which the Lyft Marks are used.

You will:

1. Use the Lyft Marks strictly in accordance with Lyft's Trademark Usage Guidelines, as may be communicated to you and revised from time to time.
2. Use the Lyft Marks only in connection with Promotional Materials of the highest quality.
3. Upon request, promptly provide to Lyft representative samples of Promotional Materials on or in connection with which you use the Lyft Marks.

You will not:

1. Use the Lyft Marks in any way that tends to impair their validity as proprietary trademarks, service marks, trade names or trade dress, or use the Lyft Marks other than in accordance with the terms, conditions and restrictions herein.
2. Take any other action that would jeopardize or impair Lyft's rights as owner of the Lyft Marks or the legality and/or enforceability of the Lyft Marks, including, without limitation, challenging or opposing Lyft's ownership in the Lyft Marks.
3. Apply for trademark registration or renewal of trademark registration of any of the Lyft Marks, any derivative of the Lyft Marks, any combination of the Lyft Marks and any other name, or any trademark, service mark, trade name, symbol or word which is similar to the Lyft Marks.
4. Use the Lyft Marks on or in connection with any product, service or activity that is in violation of any law, statute, government regulation or standard.

Except for the limited License expressly granted hereunder, no other license is granted, no other use is permitted and Lyft (and its licensors) shall retain all right, title and interest in and to the Ambassador Program and Lyft materials (including all intellectual property and proprietary rights embodied therein). You agree not to take any action inconsistent with such title and ownership.

## Relationship of Parties

You are an independent contractor and are not an agent or employee of, and has no authority to bind Lyft by contract or otherwise. You will perform the Services under the general direction of Lyft, but you will determine, in your sole discretion, the manner and means by which you accomplish the Services, subject to the requirement that you shall at all times comply with applicable law. Lyft has no right or authority to control the manner or means by which you accomplish the Services.

You will report as self-employment income all Payments received by you pursuant to this Agreement. You will indemnify Lyft and hold us harmless from and against all claims, damages, losses and expenses, including reasonable fees and expenses of attorneys and other professionals, relating to any obligation imposed by law on us to pay any withholding taxes, social security, unemployment or disability insurance,

or similar items in connection with compensation received by you pursuant to this Agreement. You will not be entitled to receive any vacation or illness payments, or to participate in any plans, arrangements, or distributions by Lyft pertaining to any bonus, stock option, profit sharing, insurance or similar benefits for Lyft's employees.

## Confidentiality

You agree not to use any technical, financial, strategic and other proprietary and confidential information relating to Lyft's business, operations and properties ("Confidential Information") disclosed to you by Lyft for your own use or for any purpose other than as contemplated herein. You shall not disclose or permit disclosure of any Confidential Information to third parties. You agree to take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information of Lyft in order to prevent it from falling into the public domain.

## Representations and Warranties

By providing the Services you represent and warrant that you are at least 18 years old and that you have the right, authority and capacity to enter into this Agreement and to abide by the terms and conditions of this Agreement. You hereby represent and warrant that you will comply with all applicable laws and regulations (including copyright and trademark laws and anti-spam laws) in connection with your participation in the Ambassador Program and you will not use the Lyft platform, Ride Codes, or anything in connection with this Ambassador Program for any illegal or unauthorized purpose. You are prohibited from advertising Ride Codes and/or purchasing any advertisements in connection with this Ambassador Program for the purpose of soliciting potential riders, including but not limited to: Google, Facebook, Twitter, Bing and Craigslist. Lyft reserves the right to deactivate or invalidate any Ride Code at any time if it feels the Ride Code has been distributed or is being used in violation of any portion of this Agreement. You shall not misrepresent your relationship with Lyft to any third party and will not make any warranty or representation on behalf of Lyft. You warrant that your participation in the Ambassador Program does not and will not violate any agreement between you and any third party. Except for the foregoing, neither party makes any warranties, express or implied, with respect to the Ambassador Program or any products or services, including without limitation implied warranties of fitness, merchantability or non-infringement of the Ride Code, the Lyft platform, or any Lyft services.

## Indemnity

You will defend, indemnify, and hold Lyft and its officers, directors, employees, agents and any third parties harmless for any losses, costs, liabilities and expenses (including reasonable attorneys' fees) relating to or arising out of your provision of the Services, including: your breach of this Agreement or your violation of any law or the rights of a third party.

## Limitation of Liability

In no event will we, our subsidiaries, officers, directors, employees or our suppliers, be liable to you for any incidental, consequential, or indirect damages arising out of or in connection with Lyft, our services or this Agreement (however arising, including negligence) even if we or our agents or representatives know or have been advised of the possibility of such damages, notwithstanding anything to the contrary contained herein, to the maximum extent allowable by law, our liability, and the liability of our subsidiaries, officers, directors, employees, and suppliers, to you or any third parties in any circumstance is limited to $100. Certain state laws do not allow limitations on implied warranties or the exclusion or limitation of certain damages. If these laws apply to you, some or all of the above disclaimers, exclusions or limitations may not apply to you, and you may have additional rights.

## Lyft E-mail and Text Communications

E-mail communications and text messages sent from us or through us are designed to make your participation in the Ambassador Program more efficient. By becoming an Ambassador, You specifically agree to accept and consent to receiving e-mail communications and text messages initiated from us or

through us, which include, without limitation: message notification e-mails, and e-mails informing you of promotions we run and of new and existing features we provide. Standard text messaging charges applied by your cell phone carrier will apply to text messages we send.

## Term and Termination

This Agreement is effective upon your provision of the Services. You may terminate your provision of Services at any time, for any or no reason. We may terminate this Agreement at any time for any or no reason, without explanation, effective upon sending written or email notice to you, or by terminating the Ambassador Program in part or entirely as posted on this site. We maintain sole discretion to prohibit your provision of the Services in the future, for any or no reason.

## Arbitration

You and we agree that any legal disputes or claims arising out of or related to the Agreement (including but not limited to your participation in the Ambassador Program and provision of the Services), or the interpretation, enforceability, revocability, or validity of the Agreement, or the arbitrability of any dispute), that cannot be resolved informally shall be submitted to binding arbitration in the state in which the Agreement was performed. The arbitration shall be conducted by the American Arbitration Association under its Commercial Arbitration Rules, or as otherwise mutually agreed by you and Lyft. Any judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Claims shall be brought within the time required by applicable law. You and we agree that any claim, action or proceeding arising out of or related to the Agreement must be brought in your individual capacity, and not as a plaintiff or class member in any purported class, collective, or representative proceeding. The arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative, collective, or class proceeding. You acknowledge and agree that you and Lyft are each waiving the right to a trial by jury or to participate as a plaintiff or class member in any purported class action or representative proceeding.

## General

This Agreement shall be governed by the laws of the State of California without regard to choice of law principles. If any provision of this Agreement is held to be invalid or unenforceable, such provision shall be struck and the remaining provisions shall be enforced. You agree that this Agreement and all incorporated agreements may be automatically assigned by Lyft, in our sole discretion. Headings are for reference purposes only and in no way define, limit, construe or describe the scope or extent of such section. Our failure to act with respect to a breach by you or others does not waive our right to act with respect to subsequent or similar breaches. This Agreement sets forth the entire understanding and agreement between you and Lyft with respect to the subject matter hereof. Sections titled Modifications, Trademark License, Relationship of Parties, Confidentiality, Representations and Warranties, Indemnity, Limitation of Liability, Arbitration, and General shall survive any termination or expiration of this Agreement.

# EXHIBIT 3



# EXHIBIT 4

2/3/2017

Gennie Dec 14.png

●●○○○ Sprint LTE     5:01 PM     ☼ ▨▨▨ ⚡

**❮** Sent            ❮   ❯

From: ████████████████

To: gennie.rim@gmail.... ❯   Hide

## Participation working on June film

December 14, 2016 at 2:52 PM

Hi, Gennie!
Maddie Lazar shared your contact info with me after I contacted her with a few questions about the new Lyft short film, June: Life is Better When You Share the Ride. I'm very happy to see the completed product and quite proud of my contribution to it, yet I did not see my name in the credits of the film

⚑     🗀     🗑     ↩     🖉

Gennie2.png

●●○○○ Sprint  LTE          5:01 PM              ☉ 🔋🔋▸ ⚡

**❮** Sent                              **❮**   **❯**

drivers who collaborated on the project. I would like to know why since I was one of the several drivers connected with the director and the producers of the film. I spent hours driving the filmmakers around, giving a tour of my neighborhood (the same southside neighborhood where June resides in the film), in fact, many of the neighborhood landmarks I took the filmmakers to visit appear in the film. I also spent significant time speaking with the filmmakers by phone and on Skype. I was contacted toward the end of the project and told that they filmmakers wanted to include my likeness in the as a

2/3/2017        Gennie3.png

●●○○○ Sprint   LTE      5:01 PM      🔋 ▓▓▓ ⚡

❮ Sent           ❮   ❯

character in the film. I was asked to sign a release, which I was happy to do. Yet after everything, my contribution was not acknowledged at all in the credits.

I was very proud to be asked to be a part of this project by Lyft because I have been a consistent advocate for the brand and the company. I have been an integral part of the growth of Lyft in the Chicago market since 2013, as a driver, mentor, ambassador and rideshare advocate. In fact, I gave the very first Lyft ride in the Chicago market. I've worked on many projects to grow the brand

   

2/3/2017                                    Genzie4.png

●●○○○ Sprint  LTE          5:02 PM              📷 ▨▩▸ ⚡

❮ Sent                              ❮    ❯

in several markets (Madison, WI,
and Indianapolis, IN to name a
few), not just Chicago. When I
was asked to be a part of the
project, I was told that they were
reaching out to me because of
my reputation as a driver and
advocate for the brand and also
because I possessed some of the
demographic similarities of the
film maker's ideation of June.

I did not expect to be paid or
compensated in any way for my
participation in this project, but
I'm confused why my name was
not included in the list of drivers
who collaborated with the
filmmakers to create this

    

demographic similarities of the
film maker's ideation of June.

I did not expect to be paid or
compensated in any way for my
participation in this project, but
I'm confused why my name was
not included in the list of drivers
who collaborated with the
filmmakers to create this
wonderful film. I'd really
appreciate it if you can provide a
reason.
Thank you so much! Looking
forward to hearing from you.
Savannah Williams

# EXHIBIT 5

2/3/2017                                JohnKahrs1.png

●●○○○ Sprint  LTE ☀️        5:00 PM           ⏱ 🔋 ⚡

**‹** Search          3 Messages           **‹**    **›**

### June credit

Found in ████████████████        📁

**John Kahrs**          12/16/16     (JK)
To: 13fullmoo... & 1 more  Details

Savannah–

Hi, it's John Kahrs. I'm really
sorry about all this. I saw your
email via Gennie. Of course
you were a contribution to the
film. The world of Chicago, of
Bronzeville: all that became
real, became detailed and
specific because of the tour
you gave us, with all the details
and locations you pointed out.

🏳️   📁   🗑️   ↩️   ✏️

2/3/2017

JohnKahrs2 (2).png

●●○○○ Sprint 🛜 ❄️          10:38 PM          🔋

❮ Search          3 Messages
                  June credit          ❮    ❯

became this character's home.
By driving us around that
afternoon, helped ground
June's story so that it existed
in a real place. I ruminated on
that statue of the great
migration and how the
Obama's house is just around
the corner, and I marveled at
how these two landmarks were
bookends of an incredible
journey, one of the great
American stories, and I hope a
little bit of that came through. I
like that there is hint of that
history in the story, and I you
are obviously proud of that
history. Coming home from
that trip, after that Memorial

    

https://drive.google.com/drive/folders/0B6_Bk0Xe0qSoRFZvSV9C3UZMMVk          1/1

2/3/2017                    JohnKahrs3.png

●●○○○ Sprint  LTE ☀            5:00 PM              ☎ 🔋 ⚡

⟨ Search                   3 Messages                 ⟨   ⟩
                            June credit

are obviously proud of that
history. Coming home from
that trip, after that Memorial
day weekend of so much
violence, I made up my mind
that I would to show a strong
woman, not penned in by
police tape and stereotypes,
but rather as someone out
there, working, changing
herself and being a force of
good. Your determination, your
attitude,and persistence and
love of that world you live in-
well, I hope there's some of
that in June too.

So, in the most literal sense of
the word- you deserve credit

    

https://drive.google.com/drive/folders/0B6_6k0Xe0qSoRFZVSVfiCSUZMMVk

2/3/2017                                JuneKahrs4.png

♦♦ooo Sprint  LTE ❄          5:00 PM                    🔋 ▮▮▮ ⚡

‹ Search                   3 Messages                  ‹      ›
                             June credit

the word– you deserve credit for that. I don't know what you're relationship is with Lyft at this point. All I know is that we were instructed to remove your name from the credits, but we weren't given any reason why.

I don't know if they've been in touch with you since you sent your email, but I hope it can be resolved. Just know that for me, the story is a better story because of your contribution.

Sincerely,

John Kahrs

        

# EXHIBIT 6

Frymire, Christine R.

**Subject:** FW: Beth 5 star driver 1760 rides

From: Lyft Support <support@lyft.zendesk.com>
To: Beth Kingsbury ████████████████████████
Date: October 3, 2016 at 4:38 AM
Subject: [Lyft] Re: change address

 Please type your reply above to unsubscribe.

Your request (20439222) has been updated. To add additional comments, reply to this email.

**lyft** Hector (Lyft)

Oct 3, 2:38 AM PDT

Hi Beth,

Thank you for reaching out and informing us that you need to have a new address updated in your profile, I am glad to assist you with it.

I went ahead into your profile and correctly updated you address to 910 W. Van Buren Suite 100 PMB 199 Chicago, IL 60607.

keep doing an awesome work Beth! 1760 rides so far with a perfect rating of 5.00 stars! WOW! You are amazing!!!

And remember, for any other request you may have, don't hesitate in contacting us back, we will be more than happy to assist you.

Best regards,

Hector

Lyft Support Representative

Help Center — http://lyft.com/help
Driver Help Center — http://lyft.com/drive/help
Ask Lyft on Twitter! — http://twitter.com/asklyft



**Beth Kingsbury**

Oct 3, 2 21 AM PDT

**Plz change my address to**

This email is a service from Lyft. Delivered t , **Zendesk**

# EXHIBIT 7

were going to be working with the people in charge of the Ambassador program to work on the harassment and that she would like Savannah to send her more information about the other experiences and who the Ambassadors were who were participating in the harassment. Miranda also said that Savannah should feel free to give the police her direct phone number and that Lyft would cooperate fully with the investigation.

Within a couple hours of that conversation, Savannah had been deactivated and I saw John Williams on Randolph and Michigan still out promoting.

Jill Koenig





**From:** Savannah Williams
**Date:** October 27, 2016 at 7:20:05 PM CDT
**To:** Lyft Support <support+id21820341@lyft.zendesk.com>
**Subject:** Re: [Lyft] Re: Follow Up from Lyft Critical Response Line
**Reply-To:** Savannah Williams

Hi Meghan,
Thank you so much for being so kind when I called you on Saturday. As you could probably tell, I was pretty shaken up. I and several other female ambassadors have been harassed and intimidated on the street by other ambassadors, male and female, while street teaming for months now. The intimidation, blocking, aggressive behavior and harassment is constant and has been increasing and becoming more blatant, threatening and more dangerous. The incident I'm reporting involved five male ambassadors, several who are also Lyft drivers, not just one person, although the most egregious behavior was displayed by Dave Todd. All five of these men harassed, intimidated, bullied, were verbally abusive, threatening and literally forced us off the street corners where we had been handing out cards for hours. All five of

these men used physically aggressive behavior and verbal intimidation toward us. Their behavior was so aggressive that we feared for our personal safety and left the area.

These are the details of what happened on Saturday, October 22, 2016. Me and three other women whom I normally street team with went to the corner of Randolph and Michigan in Chicago. There were no other ambassadors at that location. One of our group walked several blocks in all directions to determine if any ambassadors were within a three block range in any direction of our location, which we routinely do. There were no other Lyft-branded pink shirts in sight. We began handing out cards on the SW and NE corners of Randolph Street and Michigan Avenue, to of us on each corner.

At 9:33am Lamont Campbell Sr., driving a silver Equinox, license plate Q25 9198, drove past our location at Michigan Ave and turning left (West) on Randolph. He parked illegally in a tow zone a block away at the corner of Randolph and Wabash. While he was parked there, I observed several

individuals in pink Lyft-branded shirts exit his vehicle. One person crossed the street and started passing out cards at the NE corner of Wabash Avenue and Randolph, not even a block away from where I was passing out cards at Randolph and Michigan. Another individual began passing out cards on the SE corner of Wabash and Randolph. Again, they had driven past us in their vehicle, every one of the people in my group had on pink Lyft-branded shirts. There was no way they could have missed us or not seen that we were in the vicinity, less than one block from where they chose to start passing out cards. These individuals were well aware that they were upstreaming and affecting our ability to get our cards in the hands of people. There was a clear intention to surround us and intimidate by their very presence.

At some point Lamont Campbell Sr. drove away, turning south on Wabash Avenue.

At approximately 11:24am Ira Perelmutter and another ambassador named John Williams, jumped out of Lamont's

automobile at the NW corner of Randolph and Michigan where one of our group had been standing for hours handing referral cards. They rushed out of the vehicle in a very aggressive manner on the corner right in front of her, wearing pink Lyft-branded sweatshirts. She was startled, confused and fearful when they rushed out of the car because these people and others have been intimidating us, stalking our movements and the way they jumped out of the car in front of her was a very threatening act. They then walked south on Michigan Avenue. They did not speak to her or in any way acknowledge her presence at the corner, so the only conclusion to be drawn is that this act of rushing out of the car at the corner like they were going to take over was intended to threaten and intimidate us off that corner.

At 11:48am four males, Dave Todd, Ira Perelmutter and John Williams and another ambassador (identified by his code as "George" who was also wearing a pink Lyft-branded sweatshirt with the code

DAVETODD written across the front), all in Lyft-branded shirts were handing out cards at the NW corner of Washington and Michigan which is literally on the same block, slightly south of where one of our group was stationed. She was passing out cards at the SW corner of Randolph and Michigan at the Millenium Train Station entrance. A few minutes later, Lamont Campbell Sr. joined the group of men the NW corner of Washington and Michigan.

This group of ambassadors could clearly see where we were standing less than a block away. When we tried getting cards in the hands of pedestrians they were telling us they had just gotten a card from the people at the corner, referring to Dave Todd, Lamont Campbell Sr., John Williams, Ira Perelmutter and the person known as George, who were all standing less than one block away. Their obvious intent was to get closer to us, to intimidate us by their very presence, to impede our work and our ability to get our cards into the hands of the public by upstreaming us so that

pedestrians got their cards first. By doing so, they impacted our ability to earn referral fees and to effectively work our business as independent contractors. They did this, fully aware that we were at this location first and had been handing out cards for hours.

For the next several hours, this group of male ambassadors boxed us in from every direction, handing out their cards, moving from corner to corner all around us in an orchestrated effort to prevent us from getting out our referral cards and to bully, intimidate and harass us by their presence. In fact, at one point, at approximately 2:30pm, as I stood at the NW corner of Randolph and Michigan handing out cards, all five of them: Dave Todd, Ira Perelmutter, John Williams and Lamont Campbell Sr., and the person named George appeared directly across the street from where I was standing. They stood on the SW corner of Randolph and Michigan in Lyft-branded sweatshirts but did not hand out any cards. By this time, one member of our group had left to run some personal errands

so I was on the NW corner of Randolph and Michigan alone. I was very concerned for my personal safety. The other two women were promoting from the NE corner of Randolph and Michigan and I was also concerned for their safety.

These five men - "ambassadors" - just stood at this corner, milling around and not even handing out referral cards, glaring at me for approximately 15 minutes. Their behavior not only made me very uncomfortable, it was also unsettling and threatening. At about 2:50pm, they abruptly left the corner and headed West on Randolph Street.

Then, at approximately 3:25 pm as I was still standing at the NW corner of Randolph and Michigan alone handing out my cards, Ira Perelmutter, Dave Todd and the person known as George suddenly swarmed around me and started handing our cards. Ira and Dave had on a headset microphone with loudspeakers and they began shouting at pedestrians, drowning me out and

preventing me from handing out cards. They literally stepped in front of me as I tried to continue handing out cards to people. I walked up to Ira and asked him what was going on. He ignored me and continued blasting over his headset to drown me out. I told him I was not comfortable with them being here and told him that we had been on this corner for hours. His response was that it was a public sidewalk and he had a right to be there. I asked them to leave but they continued blocking my path and ignoring me and kept on handing out their cards. I then walked up to Dave Todd and attempted to talk to him. I told him the same thing I had said to Ira, that I was uncomfortable with what they were doing and that we were here first. He too ignored me. At the change of the light, Dave Todd and the person known as George headed across the street toward my two teammates at the NE corner of Randolph and Michigan. I became very frightened for our safety. I felt overwhelmed, scared, and not sure what to do.

At the same time that Ira, George, and Dave had overtaken the corner on which I had stood for hours handing cards, Lamont and John had returned to the SW corner of Randolph and Michigan (where they were earlier loitering around and glaring) and were now passing out their cards. I crossed the street and tried to talk to Lamont to find out why they felt it was alright to bully us and take over the corner where we had been working for hours. I told him I was not comfortable with their behavior and I felt that it was wrong. I told him that they could find another area in which to work, that they had seen us working this area when they first drove up and tried to offer the example that we use when promoting, which is if we see other people working an area, our group simply moves three or four blocks away out of respect and so as not to prevent any of us from making money. He basically told me they had a right to be there and that they were doing nothing wrong.

I then saw that Dave Todd and the person known as George had now forced my two teammates off the corner where they had been working, in the same manner in which they had forced me off my corner. I was very scared at this point and feared for the safety of my friends as I watched Dave Todd and the person known as George push them out of the way. I saw Dave and George push in front of them, to prevent them from handing out their cards. They literally overpowered them and intimidated them into giving up their location at the corner.

I crossed the street when the light changed and attempted to speak with Dave Todd. I asked him what they were doing and he began yelling at me, pointing his fingers in my face, stepping toward me in a menacing way with his arms waving and shouting at the top of his voice. Dave Todd continued his tirade, yelling and getting close to me as I tried to ask him in a calm tone why he felt it was okay for five guys to roll up and intimidate and bully three women.

I could see that my other two teammates, female ambassadors who had been minding their own business, trying to get out cards and promote for Lyft for hours, were clearly traumatized by Dave and George's behavior. They had also just witnessed what this group of men had done across the street when they bullied me and took over the corner where I had been trying to work.

At about 3:43pm I was still trying to talk to Dave Todd while he was shouting and pointing his fingers in my face. The fourth member of our group had returned and when she saw what was happening she walked over to George and asked him who decided to take over our corner, who told them it was okay to do so. His reply was that he just does what Dave Todd tells him to do. He pointed to Dave Todd and told her to ask Dave. As she turned to speak to Dave, he immediately focused on her, rushing toward her in a menacing manner, getting up in her face, becoming verbally abusive to her, leaning in toward her and

advancing to the point that she was forced to back up against the building in an attempt to avoid being harmed him. I tried to intervene, telling Dave that he had no right to bully us, that he was in this instance bullying us and threatening us. Some pedestrians stopped to see what was going on and others tried to avoid this awful scene.

Dave was out of control. I told my group that I could not be here anymore. My teammate said we were leaving. He continued to bully us and verbally and physically intimidate us even as we had made it clear that no longer had anything to say to him. We told him we would call 911 and he became even more enraged. We feared for our personal safety and left the area, leaving him still shouting. While all this was going on, Lamont Campbell Sr., John Williams, and Ira Perelmutter were now handing out cards on the NW corner of Randolph and Michigan Avenue, where I and another woman had been previously working. George and Dave Todd had forced

us off the NE corner of Randolph and Michigan Avenue where two other women in our group had been working. It was now 4:00pm and these five men, so-called ambassadors for Lyft had, through intimidation, bullying, aggressive behavior, physical intimidation, and verbal abuse, successfully prevented us from working for the rest of the day.

We left the area and walked several blocks away, all of us shaken to our core and emotionally unable to continue working. The behavior of these five "ambassadors" was extremely aggressive, intimidating and threatening. They spent hours bullying us, literally circling our position from every direction, preventing us from handing out cards, impeding our ability to earn and threatening our right to hand out referral cards. As I've stated before, we had been at this location for hours before they showed up. No other ambassadors were in the area when we arrived; if there had been we would have found another area to hand out our cards. This group intentionally acted to

intimidate, threaten, harass and prevent us from handing out our referral cards.

We have been subjected to harassment, intimidation, bullying, blocking, up-streaming, and down-streaming behavior by other ambassadors in the past. We don't take it lightly when several large men circle us for hours, stand in front of us yelling, being verbally abusive, moving in a menacing manner, pointing fingers in our faces and leaning in toward us invading our personal space, and I hope that Lyft doesn't take this lightly either. This was not a pleasant situation and I need Lyft to address this! We were all in a state of shock that these men were behaving this way and I am afraid for my personal well-being on the streets when I promote. Your response of October 25th shows that you all are looking into this but does not give me the assurance that these people will be removed from the platform and no longer in the position to intimidate, stalk, bully, and harass others.

This is criminal behavior and needs to be addressed by this company as it clearly violates the ambassador terms and conditions. I expect that Lyft will look into this incident and investigate it fully. These people feel this behavior is acceptable and it is not!

## Savannah Williams
Founding Lyft Driver and Ambassador, Chicago, IL

On Saturday, October 22, 2016 5:26 PM, Lyft Support <support@lyft.zendesk.com> wrote:

##- Please type your reply above this line -##
Your request (21520341) has been submitted. To add additional comments, reply to this email.

 **Meghan (Lyft)**
Oct 22, 3:08 PM PDT

Hey Savannah,

I just wanted to reach out here and follow up in regards to our conversation. Please feel free reach out here with any other details or questions that you may have. I am so sorry that you had this experience today, and please know that I am here to assist in anyway you need.

Best,

Meghan
Critical Response Line Representative

Help Center – http://lyft.com/help

This email is a service from Lyft. Delivered by Zendesk

# EXHIBIT 8

(312) 747-2652 - VCT ~ 23740 & KATOOM DETECTIVE ...

# VICTIM INFORMATION NOTICE/ CHICAGO POLICE DEPARTMENT
*THIS IS NOT AN OFFICIAL POLICE REPORT - IT IS FOR INFORMATION PURPOSES ONLY.*

INCIDENT 19146c5 *Smple*  IUCR CODE 0860

NAME OF VICTIM/COMPLAINANT *Rosalie Sue*

CASE NAME - PEOPLE OF THE STATE OF ILLINOIS/CITY OF CHICAGO vs. 20

R.D. No. HZ-487266

DATE/TIME OF OCCURRENCE 23-05 2016  1593-05-.   0:1/4

BEAT/PLACE OF OCCURRENCE 1622

If an arrest has taken place, the following is your court information: Date: 20 [X] 16  Time: 9-1:30 PM  Court Branch: 23 A-5

Court Loc: 2452 W. Belmont

If you need more help call the Victim/Witness Assistance Program of the Cook County State's Attorney's Office at (773) 869-7200.

Your case will be on file with the Chicago Police Department under the above listed R.D. Number. Refer to this number whenever you are communicating with the Chicago Police Department concerning this incident. Your case will be assigned for follow-up investigation based upon specific facts obtained during the initial investigation. The presence of these facts can predict whether a comprehensive follow-up investigation would likely result in the arrest and prosecution of the suspect(s) or the recovery of property. Your case will be reviewed and retained to a detective if criminals active in the area can be identified. A detective will routinely contact you unless additional information is required or your further assistance is needed.

## TO REPORT ADDITIONAL INFORMATION
If you have knowledge of specific facts which might assist in the investigation of your case, please contact the unit marked below:

Det. Edville Broderick

| | PROPERTY CRIMES | VIOLENT CRIMES | | SPECIAL VICTIMS | |
|---|---|---|---|---|---|
| AREA CENTRAL ☐ | (312) 747-8382 | ☐ (312) 747-8380 | | ☐ (312) 747-8385 | |
| AREA SOUTH ☐ | (312) 747-8273 | ☐ (312) 747-8271 | | ☐ (312) 747-8274 | |
| AREA NORTH ☐ | (312) 744-8253 | ☐ (312) 744-8261 | | ☐ (312) 744-8265 | |
| BOMBS SECTION ☐ (312) 745-7180 | | ARSON SECTION ☐ | | ☐ (312) 746-7618 | |

### MISSING PERSONS LOCATED
When persons reported missing are located or have returned, the MISSING PERSONS SECTION must be contacted IMMEDIATELY at (312) 747-5799 or (312) 747-2481.

### COPY OF THE REPORT
The above listed R.D. Number may suffice for insurance purposes. However, there may be instances when a company or agency may request a copy of the case report which verifies that an incident of injury, loss or damage has been reported to the Chicago Police Department. A copy of the case report may be obtained after 14 working days from the date the incident was reported. To obtain a copy of the report, send a self-addressed stamped return envelope with the amount of $50 and a written request (check or money order) payable to the "DEPARTMENT OF REVENUE/" check or money order in the amount of $50 and a self-addressed stamped return envelope to: Chicago Police Department, Records Inquiry Section, 1st floor, 3510 S. Michigan Avenue, Chicago, Illinois 60653. Include the following information with your request: 1) R.D. Number, 2) Type of incident, 3) Address of occurrence, and 4) R.D. Number.

### MAKE THE RIGHT CALL
To report an emergency or other emergency that requires immediate police response, call 911.
To report non-emergency situations, call the Police Department at 311 within City limits; or if outside the City limits call (312) 746-6000.

### CHICAGO ALTERNATIVE POLICING STRATEGY (CAPS)
#### SAFE NEIGHBORHOODS ARE EVERYBODY'S BUSINESS
The police alone cannot solve the problems of crime in our City. It takes an active and informed community working with the police and other City agencies to really make a difference. Join your neighbors and your neighborhood police officers as we work together to reduce crime and improve the quality of life in our City. Become part of the CAPS team in your community. To find out how, call 311 or visit online at:
http://www.chicagopolice.org.

You live on Beat _____

Your next Beat Community Meeting will be held on (date /time) _____

at (location) _____

CPD-11,383 (Rev. 5/13)-English

---

## TELECOMMUNICATIONS DEVICE FOR THE DEAF/TELETYPE (TDD/TTY)
Hearing-impaired persons who may communicate with the Chicago Police Department 24 hours a day by calling (312) 745-5715. Hearing-impaired persons in need of assistance during normal business hours may also call their local police district or the Special Activities Section at (312) 745-5501.

## OBTAINING A WARRANT OR SUMMONS FOR CRIMINAL CHARGES
If an arrest is made, you will be informed of the date, time, and location of the court proceedings at which your appearance will be required. When you report a crime and an arrest is not made, you may go in person to the appropriate court. Bring this Victim Information Notice and any other relevant information needed by way of a warrant or summons by the offender's name, physical description, and home address to the warrant information, sent to the court between 8:30 am and 11:30 am Monday through Friday (excluding court holidays). The warrant officer will then assist you in the process of obtaining the warrant or summons.

| Court Branch for Warrant or Summons | | |
|---|---|---|
| Branch 23 | 5555 W. Grand Ave. | |
| Branch 29 | 2452 W. Belmont Ave. | |
| Branch 34 | 155 W. 51st St. | |
| Branch 35 | 727 E. 111th St. | |
| Branch 43 | 3150 W. Flournoy St. | |

### Police District of Occurrence

| Police District of Occurrence | |
|---|---|
| ☐ | 14,15,16,17,25 |
| ☐ | 1,18,19,20,24 |
| ☐ | 2,7,8,9 |
| ☐ | 3,4,5,6,22 |
| ☐ | 10,11,12 |

• For incidents relating to domestic violence, a warrant/summons will only be issued from the Domestic Violence Court located at 555 West Harrison, on the first floor.

## AUTOMATED VICTIM NOTIFICATION (AVN)
The County of Cook has a toll free, multilingual, 24-hour Automated Victim Notification System. To obtain information about a defendant's custody status inside of Cook County Jail, call 1-877-846-3445. Do not depend solely on the AVN for your safety. If you feel that you may be in danger, take precautions as if the defendant has already been released.

## ILLINOIS CRIME VICTIMS NOTIFICATION
Innocent victims of violent crime may be eligible to receive benefits from the Illinois Crime Victims Compensation program for such costs as medical, lost wages, loss of support, and wage loss. NO **RECOVERY IS PROVIDED FOR PROPERTY LOSS OR DAMAGE NOR FOR PAIN OR SUFFERING.** To apply for Illinois Crime Victims Compensation, the victim, or if deceased, a relative or other person eligible to claim on behalf of the victim, may obtain information and claim forms to be obtained from the Illinois Attorney General's Office. Further information concerning this program can be obtained from the Crime Victims Compensation Program, Office of the Attorney General of Illinois, 100 West Randolph Street, 13th Floor, Chicago, Illinois 60601, or by calling (312) 814-2581 or 1-800-228-3368, TTY: 1-877-398-1130 or email at crimevictimservices@atg.state.il.us.

## RECOVERY OF PROPERTY - STOLEN VEHICLE RECOVERED
The Chicago Police Department must be notified IMMEDIATELY at 311 emergency number, when property reported lost or stolen is recovered.

## CREDIT CARDS - CHECKS, LOST OR STOLEN
Immediately notify the concerned credit card issuer or bank of the possibility that being liable for the unauthorized use of your credit card or check. It is suggested that you also inform the credit card issuer or bank in writing as a follow-up measure to ensure proper notification.

**IMPORTANT: RETAIN THIS NOTICE FOR YOUR PERSONAL RECORDS**

# EXHIBIT 9

# GROUP EXHIBIT 10

 Andrea Baumann Klim > Heavy

## LYFTers Marketing & Promotions

1 hr · Chicago · 🕮

There is a very rude person out here (Millennium Park at Madison & Michigan) with an old beat-up Lyft shirt on who does not work for Lyft, and is very very rude. She's passing out cards that say "extra50" but it is definitely not Jill. My daughters and I independently each tried to welcome her and say hello and introduce ourselves in a very friendly way and she just completely give us the cold shoulder - wouldn't say a word to us - not even hello. She gave me a look like I had a disease. Jill, if you are paying this person she's making you look bad.

👍 Like          💬 Comment



●●●●● AT&T LTE  8:37 PM

‹  Search



**Mattia Nanfria**

Wowsers. Jill...

1 hour ago · Like · Reply



**Dan Sifu**

Well head over there now anyone promoting or having house party fun

1 hour ago · Like · 👍 2 · Reply



**Andrea Baumann Kim**

I've been here all day with my family and she just showed up out of nowhere and was rude to all of us.

1 hour ago · Like · Reply



**Andrea Baumann Kim**





59 minutes ago · Like · Reply

 **Tyler 'Ted' Edwards**
Did you get a card from the lady to see what code she has?
59 minutes ago · Like · Reply

 **Karina Kim**
I tried to get a card from her and she wouldn't hand one to me. I had to ask a third party to grab one for us.

 Yes she is pssing out cards for Jill - cards say "Extra50"

57 minutes ago · Like · Reply

 **Gerardo Hernandez**

 

57 minutes ago · Like · Reply

 **Mattia Nanfria**
The people that are paid to hand out promo on behalf of others need to be taught about Lyft culture too, and they need to be careful not to undo all the hard work we are doing out here when we interact with potential riders and current riders alike. This person does not represent our culture, and this makes me mad.

1 hour ago · Edited · Like · 👍 3 · Reply



**We're on our way! With Ismael Madrigal**



56 minutes ago · Like · 👍 1 · Reply

 **Andrea Baumann Kim**
Thank you guys!
55 minutes ago · Like · Reply

**Madrigal**



56 minutes ago · Like · 👍 1 · Reply

 **Andrea Baumann Kim**
Thank you guys!
55 minutes ago · Like · Reply

 **Mattia Nanfria**
Thank you for speaking on it,
**Andrea.**
46 minutes ago · Like · 👍 1 · Reply



 **Andrea Baumann Kim**
Thank you guys!

 **Mattia Nanfria**
Thank you for speaking on it,
**Andrea.**

 Write a reply…

 **Andrea Baumann Kim**
Btw, get out here everyone… its a
great promo opportunity!!!!! We
passed out SOOOO many cards!
And there are still thousands of
people walking around here.
53 minutes ago · Like · Reply

# GROUP EXHIBIT 11

 **Mattia Nanfria** ▶ **Heavy LYFTers**
**Marketing & Promotions**

11 hrs · 🌐

Hello Heavy Lyfters,

 When **Keegan**, **Lamont**, and myself founded this group earlier this year, it was with the intention of sharing the awesome opportunity Lyft has given us to recruit new passengers.  We had all been drivers, and had seen a huge influx of new drivers and lots of complaints about how "slow" it was in various groups... so after Keegan and I hosted a very successful pax referral contest in the Lyft-tastic Lounge w a few other folks last winter, it made sense to put some focus on recruiting new passengers to help make everyone busier, and help everyone make more money... drivers and ambassadors alike.

What started out as a Chicago-based group quickly grew in to a national group, bringing together the BEST promoters in this company.   At no point did we think that anyone could possibly see this amazing group as a negative thing, especially since we stressed GROWTH all around... personally, and for Lyft as a company.

It is with great disappointment and utter disgust that I must share the following with all of you about a few members of our otherwise supportive, warm, and exceptional community.

This is a post from a very prolific promoter here in HLers. I've left their name out, as they will identify themselves if they see fit. The important thing is for everyone to hear, first hand, what's been going on out here on the streets of Chicago since this group was founded, and more and more promoters found immense success with promoting and marketing lyft...

_____

Hey Guys, I think we have an issue with a few members in our HL group. At first I thought this was only involving a few until I saw Lisa's post yesterday. Now I'm not sure how many people are involved. Hear me out...

There is a group of ambassadors here in Chicago that are harassing, perhaps even bullying (I don't use this term lightly), any other ambassador they come across. It is run by Beth and Jill, but there are at least two others involved that are members of HL. Here are

facts that I personally have witnessed.

They hire other to pass out their cards. Those "minions" are rude, use foul language, block others as they are promoting, and overall they are giving Lyft a bad name.

These ambassadors are also taking photos, recording using a go-pro, and collecting cards from any ambassador they come across. (I have even had one of them follow me into the restroom while recording me.)

They (claim they) are filing a lawsuit. I'm not sure if it is against individual ambassadors or against Lyft. I have been approached by someone while out promoting claiming to be a Lyft attorney. After speaking to Sasha and JP (official Chicago marking team) they have confirmed that this attorney does not work for Lyft.

These ambassadors are claiming that we are not allowed to stand within 75 feet of them. If we stand anywhere blocking their flow of traffic, even if it is blocks away, we are compromising their ability to make a living. **(This is UNTRUE BTW! -Mattia)

for their lawsuit as well as to find out where others are promoting to get more photos & cards.

I would love it if we can agree to not only remove them from HL, but can we also each take a letter of the alphabet and ask fur current screen shots of accounts. This way if they are using a false FB account to gain info they will be removed as well.

At this point I don't feel comfortable posting or even leaving many comments in HL because they are gathering info for their case. (I believe they are collecting out screen shots as well.)

Thoughts? Ideas? Help!

Now, a few things I want to make VERY clear to this community as a whole, and to Jill Koenig and **Beth Staton Kingsbury** in particular!

BULLYING AND HARASSING other LYFTERS because you feel infringed upon, because there's now competition for promo where you perceived little to none before IS NOT OKAY. There is NOTHING about

As "leaders" within our Lyft community I am DISGUSTED that you would feel it ok to try to confuse, intimidate, harass, scare, and dissuade others from coming out here and trying to make a living JUST LIKE YOU TWO. Who do you guys think you are, exactly? The streets of Chicago belong to NOBODY in particular. Not you two, nor anyone else. It is not your place to make up fake terms within the Ambassador agreement in order to give yourselves an advantage. It is not your place to send hired Goons to record other ambassadors and promoters while also harassing and intimidating them. It is disgusting that you are trying to lure people into acting inappropriately so that you can lessen the competition out here.

If you "ladies" cannot hang with all these talented promoters we have here in Chicago that is your problem. Go find a new gig, because we are not going anywhere, no matter how much you guys scheme and connive. So stop looking ridiculous with your little body cameras, hiding behind trees, lurking about and acting like weirdos. This isn't how civilized people behave!!!

We don't need Lyft HQ to tell you guys how inappropriate you are!! YOUR PEERS can tell you!!

We don't need Lyft HQ to tell you guys how inappropriate you are!! YOUR PEERS can tell you!! Just so you're aware, you will both be removed from this group shortly, but I wanted to give you both the opportunity to address the group and perhaps explain why you two think your behavior is appropriate or at all called for. I am HAPPY to say all of this to your face. I am THRILLED to let the group know that people like you exist in our otherwise peaceful world, so we can come together and make sure we SUPPORT and HELP eachother to overcome HATERS like you two.

 Like         Comment

 **25**

**Frank Zaragoza**
Ugh.... not again.... why can't people make their money and STFU?!?! There's always someone out there starting ish. Funny part is, it's usually the ones I have words with (if it's the same people I think you're talking about), I find out a few weeks or months later are up to something shady. It's like I have radar! 😩😩😩😩



**Cornell TriTek Wiley**
Boot em.

11 hours ago · Like · 👍 4 · Reply



**Mattia Nanfria**
I am appalled that a thread like this is even necessary.... but unfortunately this needs to be addressed out in the open. There have been numerous members here who have encountered these two and their minions, and we need to come together and understand what is going on here, who is responsible, and how to react if and when you are approached by them.

BETH and JILL caused this. They should be ashamed of themselves, honestly. I don't know how either of them could behave this way. I just can't fathom it. I WANT others to be successful. There's enough out here for EVERYONE! Chicago has 3 MILLION people and is a tourist mecca!!!! These people honestly think they need to promote to all these people by themselves?!?! They feel ENTITLED to the entire Chicago promo market? GTFOH with

# EXHIBIT 12

# VICTIM INFORMATION NOTICE/ CHICAGO POLICE DEPARTMENT

*THIS DOCUMENT IS FOR INFORMATIONAL PURPOSES ONLY. THIS IS NOT AN OFFICIAL POLICE REPORT.*

INCIDENT: _____ OFF. DATE/TIME OF OCCURRENCE: 02 OCT 2016 11:47 AM

R.D. No. H2 464268

NAME OF VICTIM: KOENIG, BRYANT

CASE NAME - PEOPLE OF THE STATE OF ILLINOIS/CITY OF CHICAGO vs.

BEAT OF OCCUR. 1232

If an arrest has taken place, the following is your court information. Date: 20 DEC '16   Time: 9:30am   Court Loc: 3452 W. Belmont   Court Branch: 29-5

Your case will be assigned for follow-up investigation. Date: _____

**TELECOMMUNICATIONS DEVICE FOR THE DEAF/TELETYPE (TDD/TTY)**

**OBTAINING A WARRANT OR SUMMONS FOR CRIMINAL CHARGES**

**Police District of Occurrence:**

| | | Court Branch for Warrant or Summons |
|---|---|---|
| ☐ | 14,15,16,17,25 | Branch 23  5555 W. Grand Ave. |
| ☐ | 1,18,19,20,24 | Branch 29  2452 W. Belmont Ave. |
| ☐ | 2,7,8,9 | Branch 34  155 W. 51st St. |
| ☐ | 3,4,5,6,22 | Branch 43  727 E. 111th St. |
| ☐ | 10,11,12 | Branch 43  5100 W. Harrison St. |

**AUTOMATED VICTIM NOTIFICATION (AVN)**

**ILLINOIS CRIME VICTIMS NOTIFICATION**

**RECOVERY OF PROPERTY - STOLEN VEHICLE RECOVERED**

**CREDIT CARDS - CHECKS, LOST OR STOLEN**

## TO REPORT ADDITIONAL INFORMATION

**VIOLENT CRIMES**
AREA CENTRAL ☐ (312) 747-8382
AREA SOUTH ☐ (312) 747-8273
AREA NORTH ☐ (312) 744-8263
BOMB SECTION ☐ (312) 746-7180

**PROPERTY CRIMES**
☐ (312) 747-8271
☐ (312) 747-8281
ARSON SECTION ☐ (312) 746-7618

**SPECIAL VICTIMS**
☐ (312) 747-8385
☐ (312) 747-8274
☐ (312) 744-8266

**MISSING PERSONS LOCATED**

## MAKE THE RIGHT CALL

## CHICAGO ALTERNATIVE POLICING STRATEGY (CAPS)

http://www.chicagopolice.org

CPD-11.383 (Rev. 5/13)-English

IMPORTANT: RETAIN THIS NOTICE FOR YOUR PERSONAL RECORDS

# GROUP EXHIBIT 13

 **Frank Zaragoza**
Check text

11 hours ago · Like · Reply

 **Jeanette DeLeo Finn**
And I look at it this way..... I want ALL
of us to succeed and make money for
Lyft, because if Lyft succeeds WE ALL
SUCCEED!! I don't get the me me me
of it all and you're right **Mattia**,
SHAME ON THEM!!!!

1 hour ago · Edited · Like · Reply

 Write a reply...

 **Louis Pritchett**
Get rid of their asses

11 hours ago · Like · 👍 4 · Reply

 **Frank Zaragoza**
Damn, shit just got REAL!

10 hours ago · Like · 👍 6 · Reply

 **Frank Zaragoza**
Wait, lurking behind trees?!😂😂😂😂😂😂



**Frank Zaragoza**
Wait, lurking behind trees?! 

10 hours ago · Like · 👍 2 · Reply

 **Mattia Nanfria**
YES, and BUSHES. LIKE WEIRDOS.
10 hours ago · Like · 👍 1 · Reply

 Write a reply...

**Matt Wilkison**
What?? **Beth Staton Kingsbury**, **Jill Koenig** they couldn't do this?!?
10 hours ago · Like · 👍 1 · Reply

 **Mattia Nanfria**
Oh, they can and they have.
10 hours ago · Like · Reply

 **Matt Wilkison**
Unacceptable
10 hours ago · Like · 👍 1 · Reply

 **Mattia Nanfria**
Shockingly so.

 **Mattia Nanfria**
Shockingly so.
10 hours ago  ·  Like  ·  Reply

 **Janaya Williams-Simmons**
Yeah they needed to be tagged Matt
Wilkison
10 hours ago  ·  Like  ·  👍 1  ·  Reply

 **Mattia Nanfria**
I tagged Beth, but couldn't tag Jill.
Appreciate the help w that Matt.
10 hours ago  ·  Like  ·  👍 1  ·  Reply

 **Matt Wilkison**
Smh
9 hours ago  ·  Like  ·  Reply

 Write a reply...

 **Mattia Nanfria**
Chi, I get you're frustrated, but derailing this
thread, or calling what has been said here in
doubt because of another situation, isn't
productive for what we are trying to convey
here.  There haven't been a FEW claims,
there have been MANY, MANY claiming

respected people in this community have experienced this for themselves. I did not post this lightly, or because of some heresay. THIS IS HAPPENING. There have been NUMEROUS promoters in this group who have POSTED HERE about it, and many many more who have not.

10 hours ago · Edited · Like · 👍 4 · Reply



**Zaidat Poczontek**

For Beth and Jill. 😄



 **Mattia Nanfria**
That's them when they see anyone in a pink Lyft shirt on Michigan Ave. Or Downtown. Or anywhere where there are ppl to promote to. Smh. LOL
10 hours ago · Like · 👍 2 · Reply

 **Ian Lawson**
**Mattia** I have a pink Sah-Qerity shirt and I've been harassed by their minions, I of course in my brass sense of being me, told them to GTFOH before I ate them.
9 hours ago · Like · 👍 7 · Reply

 **Mattia Nanfria**
I would have loved to have seen their faces upon encountering you. LOL
9 hours ago · Like · 👍 4 · Reply

 **Ian Lawson**
**Mattia** I'm pretty sure one of them shit themselves. On Michigan Ave. And left a trail. As they ran back to their evil lair.
9 hours ago · Like · 👍 2 · Reply



**Janaya Williams-Simmons**
I wish someone would call themselves trying to bully me out of my hustle. #NOTHAPPENING

10 hours ago · Edited · Like · 👍 11 · Reply



**Emma Fine**
This is the right way to deal with aggressive, self-serving behavior. I don't recommend fighting back to their cameras, but feel free to take shots of the people intimidating us, harassing us, and threatening legal action against our lawful action. Nothing wrong with removing them from this elective social group and reminding others what our group represents: helping each other succeed.

9 hours ago · Like · 👍 6 · Reply



**Bonny Bumiller**
Mattia's post is beautifully written: firm and serious, but with kindness and compassion.

Thank you for taking action.
One Team. One Dream.

downloads for LYFT; 100 million for the other guys--ok, yes, they're in more cities. But that means there's plenty of new pax for all of us--PLUS the ones who don't even use rideshare AT ALL yet)!

LOVE conquers HATE.

Keep Calm, and LYFT on!

8 hours ago  ·  Like  ·  👍 4  ·  Reply

 **Mattia Nanfria**
Btw... 🖤🖤🖤🖤🖤

1 hour ago  ·  Like  ·  👍 1  ·  Reply

 **Mattia Nanfria**
Great point, btw, about how many downloads Uber has vs. Lyft. Proves the point that there is more than enough for EVERYONE out here. More than enough. Which makes these 2 grown women acting like weirdos even more disheartening, because there's no need to be so selfish, callous, and outrageous. No need. This is literally some of the

there are MILLIONS of people IN CHICAGO who still haven't used Lyft. It would be utterly laughable if it weren't so disturbing.

1 hour ago  ·  Like  ·  Reply

 Write a reply...

 **Erica Watson**
I wish a bish WOULD come up to me while Im promoting!! Don't try it!! You dont want it!!! Im from the southside for real!!! Lol

8 hours ago  ·  Like  ·  👍 5  ·  Reply

 **Cornell TriTek Wiley**
My fellow south sider  please remember, we always show better than we tell!

5 hours ago  ·  Like  ·  👍 2  ·  Reply

 **Robin Russell**
I wish someone would walk up on me @95th

5 hours ago  ·  Like  ·  👍 1  ·  Reply

 **Erica Watson**



Show AND Tell was my fav at school. Lol

4 hours ago · Like · 👍 2 · Reply



**Mattia Nanfria**
Hahaha, remember that crazy lady who did just that when we were there **Robin**?! Talking all crazy?? They're like her.... hahahaha

4 hours ago · Like · 👍 1 · Reply



**Robin Russell**
Ah hell nah....the lady that we helped gave her a card lol

4 hours ago · Like · 👍 1 · Reply



**Mattia Nanfria**
LMAOOOOOOO, soooo funny. So did Matt!

4 hours ago · Like · Reply

**Lisa Jarrett**
Are you talking about the crazy lady with the heels in her hand?

3 hours ago · Like · 👍 2 · Reply

 **Jeanette DeLeo Finn**
Correct me of I'm wrong, but isn't at least one of them admin on our Lyftastic page?

6 hours ago  •  Edited  •  Like  •  👍 5  •  Reply

 **Jeanette DeLeo Finn**
......not very Lyftastic!

5 hours ago  •  Like  •  👍 1  •  Reply

 **Mattia Nanfria**
Not at all becoming of someone who has an admin slot on the best Lyft Lounge in the country, IMO. Not at all.

4 hours ago  •  Like  •  👍 1  •  Reply

 **Janaya Williams-Simmons**
Isn't Jill an admin?

4 hours ago  •  Like  •  👍 1  •  Reply

 **Mattia Nanfria**
That's who we are taking about lol.

4 hours ago  •  Like  •  👍 2  •  Reply

 Write a reply...

 Lisa Jarrett



Let me be clear, I didn't feel intimidated. I was concerned about weirdos stalking me. It wasn't until I found out who she was that I actually laughed it off. I am from the West side of Chicago, where people actually fight for corners.

This is chick is nothing but lame...corny at best.
You want to see what fighting for "territory" is really like? Get in my car and lets go for a ride. Pull that crap in KTOWN.

Please. Get over yourself.

3 hours ago  ·  Edited  ·  Like  ·  👍 5  ·  Reply



**Mattia Nanfria**
Ktown is all the streets that start with a K, right? Kostner, Keeler, Kolin, etc... what hundred blocks?

3 hours ago  ·  Like  ·  Reply



**Lisa Jarrett**
Starts at Karlov, one block west of Pulaski.  starts at 4100 west I think it runs for like a mile.

3 hours ago  •  Edited  •  Like  •  👍 1  •  Reply

 **Mattia Nanfria**
I live at 6200 s. Kostner... right outside of ktown?

2 hours ago  •  Like  •  Reply

 **Lisa Jarrett**
Well...that's South west.. I don't really know that area. I grew up around Garfield park. That's more Midway area right?

2 hours ago  •  Like  •  Reply

 **Mattia Nanfria**
Yeah, it is. It's quiet, I'm just familiar w ktown, but don't know where it ends. I'm all up in the k's. Lol. West Lawn technically.

2 hours ago  •  Edited  •  Like  •  Reply

 Write a reply...

 **Mattia Nanfria**
I'm glad you weren't intimidated by those

 **Mattia Nanfria**
I'm glad you weren't intimidated by those tactics, **Lisa**. Lame is a great descriptor lol. The thought of them trying to strong-arm anyone off a corner for any reason is laughable as all get out. LMAO

3 hours ago · Like · 👍 2 · Reply

 **Lisa Jarrett**
I'm good. I'll be back out there tomorrow. Come Holla at me Jill.

3 hours ago · Like · 👍 7 · Reply

 **Yareli Macedo**
I know a marketing specialist that specifically works with organizing ambassador teams. He works at LYFT HQ in California. If they really want to start conflict and lose their LYFT ambassador privilege then don't side step us. I'm going to write an email to him tomorrow.

2 hours ago · Like · 👍 6 · Reply

 **Mattia Nanfria**
Please do!

2 hours ago · Like · Reply



**Joni Bicknese**

I am sheriff of LYFT in NashVegas- should I head up there to Chi town?



1 hour ago · Like · 👍 3 · Reply



**Joni Bicknese**





1 hour ago  ·  Like  ·  👍 3  ·  Reply

 **Mattia Nanfria**

1 hour ago  ·  Like  ·  Reply

 **Joni Bicknese**
I have a badge too




**Frank Zaragoza**

Damn, shit just got REAL!

8 minutes ago · Like · 👍 2 · Reply



**Frank Zaragoza**

Wait, lurking behind trees?! 

😂😂😂😂

6 minutes ago · Like · 👍 1 · Reply



**Chi Suarez**

I want to take this post and claims with consideration that Mattia is genuinely concerned and cares for us. However, people are going around and exaggerating the actions of other promoters.

People want to say my brother is not nice and territorial. If anyone has a problem with my brother promoting then you should make it known to ME and not go behind the scenes, stirring shit up. Don't hide behind Keegan to send me a message. I'm very disappointed at this approach and it's unfair to Keegan to look at him as a middleman moderator.



I want to take this post and claims with consideration that Mattia is genuinely concerned and cares for us. However, people are going around and exaggerating the actions of other promoters.

People want to say my brother is not nice and territorial. If anyone has a problem with my brother promoting then you should make it known to ME and not go behind the scenes, stirring shit up. Don't hide behind Keegan to send me a message. I'm very disappointed at this approach and it's unfair to Keegan to look at him as a middleman moderator.

These claims are apparently from "a few people". We aren't in high school anymore. If you know about my brother, talk to me. Don't have a 2 month conversation about him behind my back. Another thing, I don't even know you and you don't know me. Don't talk about me as if you do.

Mattia I know this is news to you, but I needed to vent out a bit. I'm on vaca so I'm

# EXHIBIT 14



---------- Original Message ----------
From: Lyft Support <support@lyft.zendesk.com>
To: Beth Kingsbury
Date: October 19, 2016 at 6:33 PM
Subject: [Lyft] Re: Follow Up from Lyft Support

please type ...reply above ...line...

Your request (20420249) has been updated. To add additional comments, reply to this email.

Fernando (Lyft)

Oct ... 6:33 PM PDT

Follow-up from Lyft Trust & Safety
Hi Beth,

Thank you for reaching out to us. If you have concerns about your safety, please contact the police right away. Additionally, the HeavyLyfters Facebook group is a private group that is not managed or moderated by anyone at Lyft HQ or anyone in Lyft's Chicago office. If you feel targeted or excluded by that group, only Facebook can do anything about it.

Best,

Fernando

Trust and Safety Specialist

Help Center: https://help.lyft.com/hc/en-us

Beth Kingsbury

Oct. 15. 9:15 PM PDT

Since I called Critical Response on 10.02.16 and followed up with screenshots, I still have not received a response from Lyft. My complaint has to do with libelous claims and threats made about and to me, Jill Koenig, and apparently anyone we are seen promoting with. These claims and threats are being made in a LYFT CHICAGO HQ ENDORSED Facebook group called Heavy Lyfters. This group has MANY people in it from HQ. Jill, myself, and three others were ousted from the group by Mattia Nanfria, but the problematic posts about us have continued unchecked.

Here are highlights from the attached most recent screenshots:

1) Rashila Grady was out promoting on State street and had 40 cards snatched from her hand by a "crazy black lady in a wheelchair" who then stuffed them in her bra. Rashila said the lady almost got knocked the "F*** outta here wheelchair"

2) Nathan Iz says he would have pushed her out in traffic.

3) Mattia Nanfria says maybe the lady is a new "goon" in "you know who's crew."

4) ALLISON CLARK: "Where were you? If she was a homeless woman I'm pretty sure she is associated with Beth and Jill."

So we are now being associated with homeless people who assault ambassadors. Allison Clark is telling people this and THEY BELIEVE HER. This is the problem with making FALSE claims. People BELIEVE them and they TAKE ACTION based on them.

I ask LYFT once again. How is this ok? How is it ok that people are LIBELING me in a Lyft endorsed Facebook lounge? I take this very seriously. My professional reputation is being ruined by careless individuals, and my safety is being put in jeopardy. What is Lyft going to do about this???

Beth Kingsbury

███████████████████

Attachment(s)
Wheelchair lady 1.jpeg
Wheelchair lady 2.jpeg

Beth Kingsbury

I made a call to critical response on Sunday, October 2, and was assured
someone would get back to me. I still have not received follow up. Eight days
have passed. There are 922 Ambassadors in a lounge where false accusations
were made about me and Jill Koenig. There are HQ people in the lounge. Not a
single person has reached out to us, yet some of those making the outrageous
inflammatory accusations indicate they have in fact been in close contact with
Chicago HQ people. I have filed a police report and reported the online activity to
Facebook. I have attached 15 more screenshots (sent 31 originally) associated
with the original FB post in Heavy Hitters.

Here are some highlights of the attached screenshots:

1) Mattia Nanfria made a big production of blocking us, taking screenshots of
the process, as if people don't know how that works.

2) Emma Fine claims that we don't say "Hi" to her, and Jill showed up somewhere
before she did. She says in May/June there was a lot of gossip about Jill and me.
She keeps mentioning running into "minions" everywhere. They must be bad and
they must be associated with us, according to her. Elliott had an encounter with
them at Riot Fest....the "minions"... whoever those bad people are. She brings up
Ben Wood ( don't know him) and how she talked to DAVID KATCHER, Chicago
GM, about him. David has liar issues. One "liar" was running around claiming to
be a Lyft attorney. Is she saying that is me or Jill? Kinda sounds like it. She asked
David's "permission" to boot us from the FB group. She notes how happy he was

to tell her to do what she wanted (smiling ear-to-ear).

3) Chris Wojnar says we've bullied him.

4) Mike Elrod "...why isn't Lyft HQ doing anything about this as they've known for quite some time?????" Really, Mike? WHAT EXACTLY have they known? What has Lyft HQ known?

5) Bonny Bumiller is a non-practicing attorney.

6) Gideon Verdin-Williams wondered why people are wasting so much time on gossip. Maybe it's better to pass out cards. INSTANT BAN from group.

7) Mattia Nanfria apologizes to everyone the day after her Chernobyl style meltdown saying her group has been "drama-free since day 1" and "anyone who wants to bring conflict here will be removed." I've barely spoken in that group to try to stay AWAY from conflict.

8) Rashila said she was trying to have fun and "they was ruining that". I've never met Rashila in person or online. Not sure when or where I ruined her fun.

9) I included a screenshot that Allison Clark is running in a national Lyft lounge to get more promoters to join Heavy Lyfters, A CHICAGO HQ LYFT ENDORSED GROUP. So even more people will get poisoned with lies about me.

10) Leonardo Quintero supports peaceful promoting. Suggested people not focus on "those who are working against us." I don't know if he was removed from the group.

11) Larry Labow says we are Trump lovers and threatens to MACE us.

12) Mattia says we are promoters and that we don't drive. How does she know that? We've never told her that. Where is she getting that information? Does she have access to my account? "They see every other promoter as competition that needs to be eliminated...those who aren't in their little gang, that is." I have a "gang"? Really?

Is it ok with Lyft that 922 or more people now have been told lies about me and Jill that have and are continuing to cause us harm? How is that ok? Just want to emphasize that this Facebook group has been endorsed and promoted by Chicago HQ via email and at driver events. And THIS is the poison that is being

spread through the group. I just had a man show up where we were promoting yesterday in a pink Lyft shirt that I have never met, and he started harassing us and making reference to information that he most likely got from this very post. And still no phone call...

Aghast...

Beth Kingsbury

████████████████

Attachment(s)
received_10154598215697244.jpeg
received_10154598215707244.jpeg
received_10154598877997244.jpeg
received_10154598867417244.jpeg
received_10154598867412244.jpeg
received_10154598867482244.jpeg
received_10154598884192244.jpeg
received_10154598867447244(1).jpeg
14569065_10153877752857036_1701700212_n.jpg
received_10153877776282036.jpeg
received_10154598868367244.jpeg
received_10153877787282036.jpeg
received_10154610180842244.jpeg
14537060_10153877698722036_1799779130_o.jpg
14536592_10153877698717036_1102203281_o.jpg

Beth Kingsbury
█ █  █  ██ █ █ ████

Jill Koenig and I were very publicly and dramatically excommunicated from the Chicago Heavy Lyfters Facebook group overnight. A friend of ours gathered a few more screenshots before she was also booted from the group because her son made a comment that they might focus on Distributing their cards instead of

stirring up drama. Please note that David Katcher, GM of the Chicago Market, is implicated by Emma Fine. There is every reason for me to believe Lyft is complicit and even encouraging this slander and gossip. This is very very serious. There are people plotting to destroy me and my income because of rumors. If Lyft has ever had a problem with anything I was doing while trying to obtain passengers, why was I never contacted by anyone in Lyft? They never have. In fact, when I have tried to communicate with the local office to get assistance or try to become more participatory in official local marketing efforts, I have been treated in a dismissive manner. I have no problem work ing on my own or working with a couple of trusted friends. Apparently, if one does not answer to certain ambassadors, that is a crime here.

Is this Facebook witch hunt lawful? Is it ok with Lyft HQ San Francisco that I and my colleague are being slandered, defamed, and put in DANGER because of this pettiness. It is quite obvious from the screenshots alone this smear campaign has been going on secretly for MONTHS and the Chicago office is INVOLVED. I can not ignore what sits in front of my face.

Will this be ignored by Lyft HQ San Francisco? This. Must. Stop.

October 2, 2016 at 6:05 PM Lyft Support <support@lyft.zendesk.com> wrote:

Attachment(s)
received,_10154598215697244.jpeg
received,_10154598215707244.jpeg
received,_10154598215692244.jpeg
received,_10154598867442244.jpeg
received,_10154598867417244.jpeg
received,_10154598867412244.jpeg
received,_10154598867447244.jpeg
received,_10154598867482244.jpeg
received,_10154598868367244.jpeg
received,_10154598877997244.jpeg
received,_10154598882477244.jpeg
received,_10154598884192244.jpeg

Beth Kingsbury

Thank you for taking my call, Meghan. I have at this time 31 screen shots of the post in Heavy Lyfters Facebook group that I informed you about. Those have already been sent in 4 separate emails. I have been promoting with my friend, Jill Koenig, for over a year. We have been experiencing harassment online and on the street for many months but have tried to document, then do our best to promote in spite of it. Jill reached out to Critical Response in June and July and received no assistance. As a result of receiving no help from Critical Response nor the local Chicago office, she was forced to retain an attorney. The people who have been harassing us have unfortunately twisted their story to say that WE are in fact the aggressors.

The post I have sent to you was started by Mattia Nanfria, who is the owner and admin of the group, Heavy Lyfters. This group includes members of HQ including Laura Copeland, J.P. Biondi, Carlos Correa, Adrian Crededlo, and possibly others. It has over 800 members. In Mattia's post she accuses me and Jill of so many absurd atrocities I'm not even sure where to begin. When we started promoting, there was no facebook group. We just went out on the street and did it day after day. Although there are some helpful tidbits of information in the group, we've never felt comfortable getting too involved with it. As a result, it seems we are "outcasts" in the Chicago marketing world. I would be fine with being an outcast as long as people left me alone, but that is not the case. Mattia is attacking us in her post. We are being slandered and defamed, and Mattia is inciting others (many whom I've never met) to take action against us. I have never tried to bully, strong arm, stalk, or
intimidate anyone. Now I have 800+ people thinking I am the devil incarnate. How am I supposed to go out on the street to promote, let alone conduct my personal business? This MUST stop. She knows where we promote and could have approached either of us personally to discuss her concerns dozens of times, yet she never has. Instead she has chosen to try and turn the entire Lyft community against us using the FB bully pulpit and put us both in a most dangerous situation. I would also like to say that the email that is embedded within Mattia's original post appears to be from Allison Clark, another Chicago promoter. (Jill actually reported her to Trust and Safety a few months ago.) The reason I believe this is that Chris Wojnar (Chicago Promoter) informed me that Allison had a video of "one of us" filming her going to the restroom, and the

author of the email mentions someone did this to her. I do have this conversation with Chris recorded on video. Also I have no idea what he 's talking about. I've never followed Allison anywhere nor would I have any interest in doing so. I DO wear a "ridiculous" and highly visible body cam every time I go out, as my own council has advised me to do this for my protection.

Mattia is threatening to kick us out of her Facebook group, which is her prerogative, however, how bold will she be in organizing people against us when she believes no one is watching? One woman, Yareli Macedo, is threatening to contact a marketing specialist who works at SF HQ to get us deactivated because of Mattia's LIES. Ken Winokur thinks it would be great to get 25 ambassadors out to "box us in," and Mattia agrees that is "fabulous". There are laws against slander, defamation of character, and inciting people. Mattia is clearly delighting in the destruction of our reputations because we have not participated in her online group and answered to her and other fellow promoters that SHE deems to be "prolific" and "leaders within our Lyft community". Chicago HQ has turned a cold shoulder to us and has supported Mattia Nanfria, Allison Clark, and Chris Wojnar, among MANY others and possibly even encouraged them to make these claims against us. NO ONE should have to work unde r these conditions EVER.

I registered my complaint with Critical Response, which is my duty. Let the record show I do NOT accept the actions of Mattia Nanfria and those who have and are conspiring with her openly and in private to ruin my reputation and destroy my income. Thank you for giving your attention to this matter.

Beth Kingsbury

Lyft Brand Ambassador/Driver

Beth Kingsbury

screenshots #4. Final for now. I'm sure the comments will continue into tomorrow and beyond. This is a post by Chi Suarez. He appears to have been on the receiving end of some similar behavior. He is the only person who gave us the benefit of the doubt. Mattia deleted his post.

Attachment(s)
Screenshot_2016-10-02-12-30-29.png
Screenshot_2016-10-02-12-30-34.png

Beth Kingsbury

Oc⋅      ⋅ PM EDT

screenshots #3

Attachment(s)
Screenshot_2016-10-02-23-22-37.png
Screenshot_2016-10-02-23-22-43.png
Screenshot_2016-10-02-23-22-50.png
Screenshot_2016-10-02-23-22-58.png
Screenshot_2016-10-02-23-23-03.png
Screenshot_2016-10-02-23-23-11.png
Screenshot_2016-10-02-23-23-17.png
Screenshot_2016-10-02-23-23-24.png
Screenshot_2016-10-02-23-36-40.png

Beth Kingsbury

Oc      : PM EDT

screenshots #2

Attachment(s)

Screenshot_2016-10-02-23-21-23.png
Screenshot_2016-10-02-23-21-33.png
Screenshot_2016-10-02-23-21-39.png
Screenshot_2016-10-02-23-21-47.png
Screenshot_2016-10-02-23-22-00.png
Screenshot_2016-10-02-23-22-05.png
Screenshot_2016-10-02-23-22-12.png
Screenshot_2016-10-02-23-22-19.png
Screenshot_2016-10-02-23-22-24.png
Screenshot_2016-10-02-23-22-30.png

Beth Kingsbury

Oct ⋯ ⋯ PM PDT

Screenshots #1

Attachment(s)
Screenshot_2016-10-02-23-18-28.png
Screenshot_2016-10-02-23-18-34.png
Screenshot_2016-10-02-23-18-40.png
Screenshot_2016-10-02-23-18-49.png
Screenshot_2016-10-02-23-18-56.png
Screenshot_2016-10-02-23-20-26.png
Screenshot_2016-10-02-23-20-34.png
Screenshot_2016-10-02-23-20-54.png
Screenshot_2016-10-02-23-21-03.png
Screenshot_2016-10-02-23-21-10.png

lyft    Meghan (Lyft)

Oct ⋯ ⋯ PM

Hey Beth,

Per our phone conversation I am reaching out to you as a point of contact to attach photos of the things we discussed. I want to thank you for speaking with me. Someone from our Trust and Safety team will be following up in regards to your report.

Please feel free to add anything we may have missed during our talk directly to this thread as well.

Best,

Meghan
Critical Response Line Representative

Help Center – http://lyft.com/help

This email is a service from Lyft. Delivered by Zendesk.

# EXHIBIT 15

Sarah (Lyft)

Aug 27, 12:59 PM

Hello Jill,

I wanted to reach back out to you regarding your account. I've been keeping an eye on your case while Andrea has been out of office this weekend.

At this time, we are still actively working on both your Driver account and your Ambassador account. I completely understand how frustrating and inconvenient this has been, and I truly wish that I could resolve this immediately, however, this is requiring several additional parties' efforts. Please know that we are working diligently to rectify your account.

Feel free to let me know if you have any additional questions or concerns. I'm more than happy to help!

All my best,

Sarah

Lyft Support Representative

Help Center — http://lyft.com/help

Driver Help Center — http://lyft.com/drive/help

# EXHIBIT 16

Frymire, Christine R.

Subject:                          FW: Must talk

From: "Finkel, Noah A." <NFinkel@seyfarth.com>
Date: November 4, 2016 at 8:58:43 AM CDT
To: "'Platt, L Steven.'" <LSPlatt@rsplaw.com>
Cc: "Petersen, Kyle A" <KPetersen@seyfarth.com>
Subject: RE: Must talk

Steve, I just tried you and left you a voicemail. As explained on it, I am going to be on calls or in meetings from 9 to 11:30 this morning so I am going to tell you what I know in this email.

In light of the conflicts, which were brought to a head with the police reports, Lyft has conditionally deactivated a number of individuals from the group we've referred to previously as part of the "Heavy Lyfters" who you say have harassed Ms. Koenig, Ms. Kingsbury, and, as of last night, Ms. Koenig as well. Indeed, I was going to call you this morning to inform you of that fact. All are being conditionally deactivated pending further investigation. As I understand it, Ms. Koenig had sought an arrest warrant for these people and provided the Chicago Police with video evidence, but the Chicago police opined that the video evidence appeared to have been selectively edited and thus, in effect, doctored. Indeed, Ms. Koenig would have been conditionally deactivated earlier, but Lyft waited while it attempted to resolve all technical issues surrounding her dashboard. It has resolved many of those issues, and will provide her with all appropriate payments, but it has not yet resolved all. It decided yesterday to conditionally deactivate her as well because resolving the final issues surrounding the dashboard was taking longer than anticipated.

--Noah

Noah Finkel | Seyfarth Shaw LLP
131 S. Dearborn Street | Suite 2400 | Chicago, Illinois 60603-5577
Direct: +1-312-460-5913 | Mobile: +1-312-925-5036 | Fax: +1-312-460-7913
nfinkel@seyfarth.com | www.seyfarth.com

------------------------------------------
The information contained in this transmission is attorney privileged and/or confidential information intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited.
------------------------------------------

-----Original Message-----
From: Platt, L Steven. [mailto:LSPlatt@rsplaw.com]
Sent: Friday, November 04, 2016 8:27 AM
To: Finkel, Noah A.
Subject: Must talk

We need to talk asap - your client has deactivated Beth Kingsbury for "violation" of community standards - she is Jill Koenig's right hand person - they have twice reported the ring leaders of the harassers to the police and have had them picked up - they called your client's hot line - Lyly told them they were deactivating them but instead of deactivating the ring leaders they deactivated the accusers- we have videos and proof

What are your people doing?

They are siding with the perpetrators!!!

Call me now

Sent from my I Phone
L.Steven Platt | NEW DIRECT: (312)456-0285 | cell (312)720-3834| Robbins Salomon & Patt Ltd.| 180 N. LaSalle, Suite 3300, Chicago, IL 60601| lsplatt@rsplaw.com

# EXHIBIT 17

**Frymire, Christine R.**

| | |
|---|---|
| **Subject:** | FW: Lyft |
| **Attachments:** | image001.gif; image002.jpg; image003.jpg; image004.jpg |

**From:** "Finkel, Noah A." <NFinkel@seyfarth.com>
**Date:** November 4, 2016 at 5:14:15 PM CDT
**To:** "'Platt, L Steven.'" <LSPlatt@rsplaw.com>
**Cc:** "Petersen, Kyle A" <KPetersen@seyfarth.com>
**Subject:** RE: Lyft

Lyft had concluded, based on its investigation, to reactivate those three individuals. It has not reached any conclusions about reactivation as to anyone else.

Noah Finkel | Seyfarth Shaw LLP
131 S. Dearborn Street | Suite 2400 | Chicago, Illinois 60603-5577
Direct: +1-312-460-6913 | Mobile: +1-312-925-5036 | Fax: +1-312-460-7913
nfinkel@seyfarth.com | www.seyfarth.com



The information contained in this transmission is attorney privileged and/or confidential information intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited.

**From:** Platt, L Steven. [mailto:LSPlatt@rsplaw.com]
**Sent:** Friday, November 04, 2016 3:18 PM
**To:** Finkel, Noah A.
**Subject:** Lyft

Your e-mail is incorrect – Lamont Campbell, Dave Todd Perelmutter, Ira Perelmutter – all three named on my clients' police report, one on an assault, the others for stalking, intimidation and harassment – all of whom Lyft's Trust and Safety hotline told my clients were "deactivated" because of this behavior and the police reports – all are on the street today very much engaging in Ambassador activity and handing out their cards.

Your letter and your client's practices are dramatically incorrect. I will send you photos to prove the same.

If your client cares at all about the truth they will do something about this—otherwise it is pretty clear that they have no regard for the truth. And we will take action accordingly.

S

# EXHIBIT 18

## CONSENT TO BE A PARTY PLAINTIFF

The undersigned hereby authorizes and engages Robbins, Salomon & Patt, Ltd. to pursue her claims for unpaid wages and other relief, against Lyft Inc., and any other person or entity who may have employed her in conjunction with said corporation (collectively "Employers"), and by the signature below, the undersigned hereby consents to be a party plaintiff in a lawsuit brought against the Employer(s) on behalf of himself and all other similarly situated employees, known and unknown.

SAVANNAH WILLIAMS,

## CONSENT TO BE A PARTY PLAINTIFF

The undersigned hereby authorizes and engages Robbins, Salomon & Patt, Ltd. to pursue her claims for unpaid wages and other relief, against Lyft Inc., and any other person or entity who may have employed her in conjunction with said corporation (collectively "Employers"), and by the signature below, the undersigned hereby consents to be a party plaintiff in a lawsuit brought against the Employer(s) on behalf of himself and all other similarly situated employees, known and unknown.

JILL KOENIG,